STERN et al. v. UNITED STATES.†

(Circuit Court of Appeals, Third Circuit. February 15, 1912.)

No. 66 (1,545).

1. BANKRUPTCY (§ 495*)—OFFENSES AGAINST BANKRUPTCY LAW—CONCEALMENT—EVIDENCE.

That bankrupts, individually and as partners, concealed property from the trustee in bankruptcy, and that they conspired so to do, may be proved by circumstantial evidence, provided it is such as in the practical affairs of life tends to produce belief and conviction of guilt.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 495.*]

2. BANKRUPTCY (§ 495*)—CONCEALMENT OF PROPERTY BY BANKRUPTS—EVIDENCE—SUFFICIENCY.

Evidence held to justify a conviction of bankrupts of concealing property from the trustee in bankruptcy.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 495.*]

3. BANKRUPTCY (§ 495*)—CONCEALMENT OF PROPERTY FROM TRUSTEE—EVIDENCE.

Proof that bankrupts, charged with concealing money from the trustee in bankruptcy, and with conspiracy to conceal the same, denied, on their examination and demand by the trustee therefor, that money shown to have come into their hands within a month of their willingness to

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

† Rehearing denied.

be adjudged bankrupts was in their possession, and that they failed to account for the same, was competent to show guilt.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 495.*]

4. BANKRUPTCY (§ 495*)—CONSPIRACY TO CONCEAL PROPERTY FROM TRUSTEE IN BANKRUPTCY—EVIDENCE—SUFFICIENCY.

Evidence *held* to support a conviction of conspiracy by bankrupts to conceal property from the trustee in bankruptcy.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 495.*]

5. CRIMINAL LAW (§ 1169*)—HARMLESS ERROR—ERRONEOUS ADMISSION OF EVIDENCE.

Where, on a trial of bankrupts for concealing and conspiring to conceal merchandise from the trustee in bankruptcy, the evidence showed that the merchandise had been sold by the bankrupts to a third person in a city in a sister state, that he was a relative of one of the bankrupts and without business standing or reputation, and known as a peddler, and counsel of the bankrupts, on the cross-examination of the receiver went into the question of the financial responsibility of the third person, the admission in evidence of the testimony of a witness, representing the trustee, as to his investigations, with a view of recovering the merchandise or the price thereof, together with the statement that he did not bring suit against the third person because he thought it would be a waste of money to do so, was not prejudicial error.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 3137–3143; Dec. Dig. § 1169.*]

In Error to the District Court of the United States for the Eastern District of Pennsylvania.

Joseph Stern and others were convicted of crime. There was a judgment of the District Court (186 Fed. 854), denying motions in arrest and for new trial, and they bring error. Affirmed.

See, also, 177 Fed. 479.

Owen J. Roberts, for plaintiffs in error.

John C. Swartley, Asst. U. S. Atty. (J. Whitaker Thompson, U. S. Atty., on the brief), for the United States.

Before GRAY, BUFFINGTON, and LANNING, Circuit Judges.

GRAY, Circuit Judge. The writs of error in this case bring before us two indictments found in the court below against the plaintiffs in error, at the March term, 1910.

The first of these indictments sets out by way of preamble that the three defendants, individually and as members of the firm of J. Stern & Sons, had their principal place of business, residence and domicile in the city of Philadelphia, state of Pennsylvania, within the territorial jurisdiction of the court below; that on the 31st day of March, 1909, certain persons, as creditors of the said firm, filed their petition in bankruptcy, seeking to have the said defendants, individually and as members of the firm of J. Stern & Sons, adjudged bankrupts; that the said petition set forth the debts owing by the defendants, trading as aforesaid, to the petitioning creditors, respectively, and that the cause of bankruptcy was that they, the defendants, then and there trading under the firm name of J. Stern & Sons, admitted in writing their insolvency and their inability to pay their debts and their willingness to be adjudged bankrupts on that ground; that up-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

on the 23d day of April, 1909, the defendants, individually and as members of the firm of J. Stern & Sons, were duly adjudged bankrupts by an order of the said District Court; that on the said 23d day of April, the proceedings in bankruptcy were duly referred by an order of the said District Court to one of the referees in bankruptcy of the said Eastern district of Pennsylvania, and upon the 4th day of June, 1909, one J. Howard Reber was duly and legally appointed the trustee of the bankrupt estate of the said defendants, individually and as members of the said firm of J. Stern & Sons, and thereupon was duly and legally qualified as such.

The indictment then charges that the three defendants, on the 9th day of June, 1909, fraudulently concealed, while bankrupts, from their trustee certain merchandise specifically described, and in addition thereto $27,000 in cash. The other indictment found at the same time charged that the three defendants, on June 9, 1909, conspired to commit an offense against the bankrupt law of the United States, by fraudulently concealing the merchandise and moneys above mentioned, and that the overt act committed in pursuance of said conspiracy was that the three defendants did, on the said June 9, 1909, fraudulently conceal the merchandise and money aforesaid. The defendants were tried jointly on both indictments at the same time. The jury returned a verdict of guilty on each of the indictments as against each defendant. Motions for a new trial and in arrest of judgment were overruled by the trial court. 186 Fed. 854. The defendant, Joseph Stern, was sentenced to pay a fine of $100, Charles Stern was sentenced to imprisonment for five months, Benjamin Stern to imprisonment for nine months, and each defendant sentenced to pay one-third of the costs.

From these judgments, separate writs of error have been sued out by each defendant, each assigning the same errors. These assignments are 46 in number, approaching the limits of tolerance with which prolixity of this kind is viewed by appellate courts. The learned counsel for the plaintiff in error, who so ably argued the case before us, has however greatly assisted the court by grouping these assignments under six different heads, as follows:

"I. There was no competent evidence to prove that moneys were concealed by the defendants.

"II. There was no concealment of merchandise.

"III. There was no proof of conspiracy to conceal either merchandise or money.

"IV. Assignments of error relating to irrelevant and incompetent evidence.

"V. The learned trial judge's comments upon the testimony of Lewis Stern prejudices the defendants.

"VI. The charge to the jury was inadequate and unduly favored the prosecution."

The indictments presented for determination by the jury the broad general questions, whether the defendants, or any of them, had in the manner set forth in the first indictment knowingly and fraudulently concealed, while bankrupts, from the trustee of the bankrupt's estate, the large quantity of personal property mentioned in the indictment, and further had concealed in like manner the said sum of

$27,000. Also whether, under the second indictment, the said defend--
ants had individually and as members of the firm of J. Stern & Sons,
conspired among themselves, "or with divers other evilly disposed
persons unknown to the grand jury," to commit an offense against
the United States of America, by knowingly and fraudulently con-
cealing the property and money mentioned in the first indictment.

Assuming that the question is properly raised by the assignments
of error, we must therefore inquire whether there was competent
evidence upon which the jury could find that either merchandise or
moneys were knowingly and fraudulently concealed by the defendants
from the trustee in bankruptcy, or that there was conspiracy so to do.

[1] We may assume from our knowledge of human affairs and
human conduct, that the offenses denounced by the bankrupt law and
set forth in the indictments are not such as can be readily proved by
direct testimony. The very description of the offense indicates that
this must be true. "Concealment" is the very essence of the conduct
denounced by the law, and a court and jury in administering this law
are not dealing with open and flagrant acts of the defendant, but with
the fact of concealment itself. The evidence, therefore, in such cases
must accommodate itself to the issue to be tried, and be such as in the
practical affairs of life tends to produce belief and conviction in the
minds of those to whom such evidence is addressed. In other words,
the evidence must in general be largely, if not wholly, circumstantial,
and be in large measure governed by what the trial court in its judicial
discretion shall consider its appropriateness to the issue presented in
a particular case. It must be "evidence which inferentially proves
the principal fact by establishing a condition of surrounding and lim-
iting circumstances whose existence is a premise from which the ex-
istence of the principal fact may be concluded by the necessary laws
of reasoning." In a criminal case, of course, such surrounding con-
ditions and circumstances must be such as are inconsistent with the
hypothesis of the innocence of the party accused.

[2] With these observations in mind, a careful examination of
all the testimony disclosed by the record does not convince us that
there was not competent evidence adduced in the case upon which
the jury were justified in finding a verdict of guilty against the de-
fendants, of having conspired to conceal, and of having concealed,
money and property from the trustee in bankruptcy, as charged in
the indictments. Money was undoubtedly traced to the possession of
the defendants during the latter part of February and the month of
March, 1909, of which they failed to give any satisfactory account.
These sums aggregated over $20,000. Nearly $6,000 thereof was
for a sale, net cash, of over 100,000 yards of cotton goods shipped
to the purchaser in Boston and paid for in four or five installments
during the months of February and March. It must have been dur-
ing the latter part of March that the defendants admitted their in-
solvency and consented to an adjudication of bankruptcy. During
that month, there is also evidence that the sum of $7,550 was received
by the defendants on assigned accounts. These sums, together with
the amounts drawn by the defendants from two banks during the

month of March, make up the aggregate which we have mentioned. No account of these sales, or of money received therefor, or of the money drawn from the banks, appears anywhere on the books of the said firm, nor is any satisfactory explanation made on behalf of the defendants as to what became of this money. It is suggested, rather than testified, by Lewis Stern, nephew of the defendants and bookkeeper of the firm, that some of it might have been used for the weekly pay rolls during the month of March. No such pay rolls are produced, nor is there any definite evidence as to what they amounted to, and no testimony except that of Lewis Stern, the bookkeeper, to which we have just referred. There is offered also the record of a suit brought by the trustee against one Charles Nemcof, to recover the sum of $7,400, alleged by the trustee to have been preferentially paid to the said Nemcof by the defendants in violation of the bankrupt law. The suit appears never to have been prosecuted, and no testimony taken therein, and Nemcof himself was not called as a witness.

[3] That this money thus unaccounted for was concealed from the trustee after the bankruptcy, depends upon the evidence that the said defendants, upon their examination and demand made by the trustee therefor, denied that it was in their possession and failed to give any account of the same. Taken with all the other evidence in the case, we think that this evidence was competent and sufficient to justify the jury in finding the fact of concealment after the bankruptcy.

It is difficult to imagine circumstances under which the burden of explaining a fact or situation would be more clearly and peremptorily cast upon those charged with a criminal offense, than was the burden in this case cast upon the defendants to account for the disposition of the large sum of money traced as coming into the hands of those defendants within a month before—much of it within a few days before—they acknowledged their insolvency and willingness to be adjudged bankrupts. As part of the surrounding circumstances and relevant to a situation from which an inference of guilt might properly be drawn, it was shown by the government that there were certain falsifications in the bookkeeping between the latter part of the year 1908 and March 31, 1909. Stub check books on two banks during the same period showed falsifications of the names of payees of a large number of checks during that period; that is, the name appearing on the stub check book as payee did not correspond with the payee on the check, and in many cases one or the other was shown to be a nonexistent person. It was also shown that the day book and ledger—the former with entries up to September 17, 1908, the latter to May, 1908—were taken down by Lewis Stern, the bookkeeper, to his home in New Jersey, as he says to enable him to open a new day book and ledger. The new day book and ledger were the only ones produced at the hearing, the witness testifying that the old day book and ledger were lost; that they were left at his house and could not be found. The testimony as to the loss and non-production of these books is in the last degree unsatisfactory. The witness testifies that he took the old books home for the purpose of opening up new books, and that

it was a matter of only two or three days' work; that he brought the new books back, but could not find the old ones to bring back with them. Both sets were on the table where he was making the transfers, and no explanation was attempted to be given why the old books should be lost any more than the new ones. The testimony of the confidential bookkeeper in this respect, as well as in others, was legitimately calculated to produce an impression upon the minds of the jurors unfavorable to the defendants.

These facts, in connection with the utter failure to explain why sales, and the receipt of money therefor, to the amount of over $20,-000, were represented by no entries upon the books of the concern, and the unsuccessful attempt of the only witness who spoke of these transactions, Lewis Stern, the nephew and bookkeeper of the bankrupts, may well have produced in the minds of the jury a conviction beyond reasonable doubt as to the guilt of the defendants.

[4] The charge of conspiracy in the second indictment rested upon the same evidence. The defendants were all members of the same firm, were all cognizant of its business, and all failed to account for the incriminating circumstances to which we have above referred. Whenever begun, this conspiracy may well have been found to have continued until the 9th day of June, or after the examination of the defendant.

What has been said as to the evidence in regard to fraudulent concealment of moneys, applies also to the charge of fraudulent concealment of the property specified in the indictments. The conditions testified to in relation to the one charge, obtain also in the other and constitute part of the circumstantial environment of the whole case. Referring to the evidence, it was shown that the property mentioned in the indictments was sold by the bankrupt firm to one Julius Franks, in Lawrence, Massachusetts; that Franks was a young man, the brother-in-law of Charles Stern; that prior to December 19, 1908, he had not been engaged, so far as the evidence shows, in any business except peddling; that a short time prior to that date, he had rented a store, and on that date occupied the same; that the defendants had shipped to him prior to this date a large quantity of shirt waists, amounting to the sum of $1,672.75, as appears in the ledger of the defendants; that after this bill was long overdue, to wit, January 23, 1909, and while it remained unpaid, and while Franks already owed $2,393.25, the defendants continued to make shipments to him, to the amount of $2,192.50, making his total indebtedness $4,585.75. During this time, the letters offered in evidence by the government and identified by the witness, Lewis Stern, the bookkeeper, as having been received by defendants from their customers, showed that the customers were demanding of the defendants to fill their orders. Copies of letters written by the defendants as they appeared in the press letter copy book, showed that at the time the defendants were shipping these large quantities of shirt waists and ladies' dresses to Franks, they were repeatedly saying in these letters that they were unable to pay their debts, because their collections were slow, and that they were hard pressed for money. It was shown, therefore, by the govern-

ment, that between September 30, 1908, and February 19, 1909, the defendants did deliver to Julius Franks shirt waists and dresses amounting to the sum of $4,585.75, and that the books of the defendant do not show that this sum of money was ever paid or any part thereof, or that any attempt was ever made to collect the same.

The books show no uncollected accounts prior to December 17, 1908, and show that the sales after that date amounted to $56,257, all of which, except the so-called sale to Franks and a few small items in addition, were collected or otherwise disposed of. Franks was shown to be a young man, a brother-in-law of a member of the firm, without previous business standing or reputation and as having been, up to the date of this shipment of goods, known as a peddler. A witness (Mayer) sent on after the trustee was apointed, for the purpose of investigating this transaction of Franks', testified that he was there in July, 1909, that there was no store there, that all the goods had been taken away by the 1st day of April, 1909, and that from his investigation he thought it would be a waste of the money of the estate to bring suit against Julius Franks. No proof was offered by the defendants, as to what was done by these goods by Franks, and no other account than that they were sold to Franks under the circumstances detailed, was given by or on behalf of the defendants. At the trial under the indictments, Franks was not called as a witness, or any explanation given as to why he was not called. On the whole, we see no reason for saying that there was not competent evidence in the case to justify the verdict rendered by the jury on both indictments.

To the assignments of error relating to irrelevant and incompetent evidence, small space is devoted in the long and elaborate brief of the plaintiffs in error. We will content ourselves with saying that, notwithstanding the ingenious argument and suggestions of the learned counsel for the plaintiffs in error, no one of the assignments in that regard discussed in the brief, and which are for the most part technical in their character, discloses injurious error, if error at all.

[5] One of the assignments of error (the eighteenth) which might properly have been grouped under this head has not been adverted to in the printed argument of the brief, nor is it comprehended in the statement of the questions involved as set forth on pages 2, 3, and 4 thereof. It was presented to us, however, in the oral argument by counsel for the plaintiff in error, and must receive the attention which his argument deserves. This assignment is as follows:

"18. Because the learned trial court erred in permitting Clinton O. Mayer to testify as follows (pages 189, 190):

" 'Q. What, if anything, did you find there in reference to the property that had been shipped to Julius Franks by Stern & Sons?

" 'Mr. Scott: Of your own knowledge. I object to him saying anything unless it is from his own knowledge.

" 'A. My knowledge is what the man himself told me.

" 'Mr. Scott: I object to that.

" '(Objection overruled. Exception noted for defendants.)

" 'A. Julius Franks said that on or about the 1st day of April, 1909—

" 'Mr. Scott: I renew my objection on the ground that this is mere hearsay; that we have not Julius Franks here to cross examine, and Mr. Mayer cannot testify to a conversation he had with anybody else.

" 'By Mr. Swartley: Q. Just confine yourself to what you found in your personal investigation. A. I found that there was no store there at that time. Q. When was that? A. Well, I was there in July. Q. Of 1909? A. 1909. That all the goods had gone out of there on the 1st day of April, 1909. My investigation found the goods had all been removed out of there about that time.

" 'Mr. Scott: Is your honor permitting him to testify to what he heard by hearsay?

" 'By the Court: Q. You were there when? A. July, 1909. When I was there in July there was no store there, and Julius Franks—do you want to know what he was doing at that time?

" 'By Mr. Swartley: Q. After your investigation of the financial condition and financial ability of Julius Franks to pay, did you or did you not deem it advisable to institute proceedings to recover on this bill of goods against Julius Franks?

" 'The Court: I ruled on this once.

" '(Objected to. Exception noted for defendants.)

" 'Q. Tell me all you did in the way of investigation. A. I interrogated all his family; I had a record search made as to whether he owned any real estate, and I talked to several lawyers up there who knew who the man was, and as a result I did bring a suit for the first bill against Franks Bros., because the first bill was charged to them as well as to Julius Franks, and as against him I did not bring any suit, because I thought it was a waste of money of the estate.

" 'Mr. Scott: I move to strike that out.

" '(Motion overruled. Exception noted for defendants.)' "

The first thing to be said in regard to this assignment of error is, that the first objection which was overruled and exception noted, in the course of the testimony recited under this assignment, was to an uncompleted answer of the witness, innocuous as far as it went, and the completion of which was not asked for by the counsel for the government. The witness having been stopped by the objection before any conversation with Franks was repeated, counsel for the government, though the objection seems to have been overruled, instructed the witness to confine himself to what he found upon his own personal investigation. The witness then says:

"I found that there was no store there at that time. That was in July, 1909; that all the goods had gone out of there on the 1st of April, 1909. My investigation found that the goods had all been removed out of there at that time."

Counsel for the defendant did not object to this, but said:

"Is your honor permitting him to testify to what he heard by hearsay?"

The court then asked the witness:

"You were there when?" "A. July, 1909. When I was there in July, there was no store there, and Julius Franks—do you want to know what he was doing at that time?"

To this question by the witness, no answer was made, but counsel for the government immediately asked:

"Ater your investigation of the financial condition and financial ability of Julius Franks to pay, did you or did you not deem it advisable to institute proceedings to recover on this bill of goods against Julius Franks?"

This question was objected to, presumably allowed, and exception noted for defendants. The question was not directly answered, but another question was put by counsel for the government, as follows:

"Tell me all you did in the way of investigation." "I interrogated all his family; I had a record search made as to whether he owned any real estate, and I talked to several lawyers up there who knew who the man was, and as a result I did bring a suit for the first bill against the Frank Brothers, because the first bill was charged to them as well as to Julius Franks, and as against him I did not bring any suit, because I thought it was a waste of money of the estate."

While the answer tells what he did by way of investigation, the witness does not testify as to what was told him by the members of the family, or by the lawyers with whom he talked. He does say, however, in answer to the question as to what he did as the result of his investigation, that he brought a suit for the first bill against Franks Bros., because the first bill was charged to them as well as to Julius, but that as against the latter, he did not bring suit, because he thought it was a waste of money to do so. This answer, taken as a whole and elicited by the question objected to, we think is close to the dividing line, but, under the peculiar circumstances of this case we hardly think that it transgresses it even technically. The answer contains no hearsay statement. What the witness testifies to is what he did and did not do as a result of his investigation. He had already testified, without objection, that he had found no store in Lawrence occupied by Franks, and that all the goods had gone out of there on the 1st day of April, 1909, and had been removed from there about that time. There can be no question that this evidence was pertinent and competent. Goods belonging to the bankrupt estate, as to the disappearance of which Benjamin Stern had failed to give any satisfactory account, were properly sought to be traced by the witness, as an agent, first of the receiver and afterwards of the trustee. The result of that investigation was given without transgressing the rule as to hearsay evidence. He found no store there, and though he said that he had learned that all the goods had been removed about the 1st of April, that statement was not objected to. The witness, representing the trustee, was called upon to do what he could by legal process, or otherwise, to recover possession of goods believed to have been fraudulently disposed of by the bankrupt. He says he found the goods had been removed, and that from his investigation he thought it was not worth while to bring suit against Franks. It is not unusual in the trial of cases that witnesses are permitted to state that their conduct is the result of information, the character of which they are not permitted to testify to.

But there is a further fact that is not unimportant in its bearing upon the discretion exercised by the judge in permitting this testimony. The question of Franks' financial responsibility was gone into at great length by defendants' counsel, on cross-examination of Mr. Reber, the receiver, by referring him to the examination of Benjamin Stern, under the date of May 17, 1909, before the receiver and his attorneys. This examination was very significant in its showing of the irresponsibility of Franks and suggestive in a most marked degree of the lack of good faith on the part of Stern as to the transaction in question between him and Franks. In view of this testimony, as well as of the other testimony recited under the assignment,

we feel quite satisfied that, even if there be a technical error, there was no prejudicial error in the discretion exercised by the judge in refusing to strike out the answer objected to.

It only remains to say that those assignments of error which relate to the comments of the judge at the trial upon the testimony of Lewis Stern, and to the judge's charge to the jury, are without merit. The judge's charge as a whole was fair to the defendants, and so also were his answers to the points made by the defendant in regard to instructions.

We are of opinion, therefore, that the judgments below should be affirmed, and it is so ordered.