**COHEN et al. v. UNITED STATES.**

**No. 3550.**

Circuit Court of Appeals, Fourth Circuit.

Nov. 18, 1933.

W. A. Self, of Hickory, N. C., and Charles A. Jonas, of Lincolnton, N. C. (Bailey Patrick, of Hickory, N. C., on the brief), for appellants.

Frank C. Patton, U. S. Atty., of Morganton, N. C. (Thos. A. McCoy, Asst. U. S. Atty., of Asheville, N. C., and C. R. Jonas, Asst. U. S. Atty., of Lincolnton, N. C., on the brief), for the United States.

Before PARKER and SOPER, Circuit Judges, and CHESNUT, District Judge.

SOPER, Circuit Judge.

Harry and Abe Cohen, who had been adjudicated bankrupts upon their voluntary petition on January 14, 1930, were convicted in the District Court under an indictment charging them with having knowingly and fraudulently concealed from the trustee in bankruptcy, appointed February 6, 1930, large portions of the assets of their bankrupt estate, in violation of section 29b (1) of the Bankruptcy Act (30 Stat. 544, 554, as amended by Act of May 27, 1926, c. 406, § 11, 44 Stat. 662, 665, 11 USCA § 52 (b) (1). They were sentenced to imprisonment for a year and a day, and appealed, assigning as error the denial of their motions, at the close of the government's evidence in chief, and at the close of all the evidence, for a directed verdict of not guilty, urged on the ground that the evidence was insufficient for submission to the jury.

The evidence for the government, which on such a motion must be considered in the light most favorable to the government's contention, showed that appellants (hereinafter referred to as defendants) had for some five years prior to their bankruptcy conducted as partners in Hickory, N. C., two retail dry goods stores, Cohen's Department Store and The Hub, selling principally ready-to-wear clothing and shoes. The stocks of goods in the two stores were appraised after bankruptcy at $11,365.30, and were sold by the trustee for $7,500. Other minor assets brought the total to $7,681.18. Claims in the aggregate of $62,431.37 were filed, on which the total dividend paid to unsecured creditors was 6½ per cent. The only books and records turned over to the trustee were a journal and a ledger, showing only accounts payable for merchandise purchased for the two stores, and two small books listing accounts receivable in the sum of $4,360.69, which proved to be worthless. The wife of one of the defendants testified that she kept these books, that she was not a trained bookkeeper, and that no other books of account were kept.

There was no direct evidence of the concealment of property from the trustee, but the government undertook to prove its charges by showing a shortage in the assets turned over to the trustee as compared with the amount which should have been delivered as shown by the available records. The evidence on behalf of the prosecution tended to show that the value of the goods on hand on January 1, 1929, was $38,962.28, and that the total purchases during 1929 amounted to $87,274.52, or a total of $126,236.80 to be accounted for; while the total sales were only $62,921.96, so that goods of the value of $63,314.84 should have come into the hands of the trustee. This figure was compared with the sum of $11,356.30, the appraised value of the merchandise actually received by the trustee, and with the sum of $30,000, the value of the goods on hand as stated in the schedules filed by the bankrupts. In other words, the shrinkage unaccounted for was $51,958.54 if the appraisal was accepted, or $33,314.84 if the

value declared by the bankrupts was taken as true.

To establish these figures, the journal and ledger were used to show the amount of the purchases during 1929, and the partnership income tax return for that year to show the amount of goods on hand at the beginning, and the gross receipts from sales during the year. The amount on hand at the beginning of the year was also verified by two written statements of the financial condition of the firm as of January 2, 1929, signed by one of the members of the firm, and used to obtain credit. The net worth shown by these statements, to wit, $40,419.43, furnishes a striking contrast with the total assets coming into the hands of the trustee for distribution amongst the creditors. The books of account, as we have seen, were kept by the wife of one of the partners, and the income tax return was made up after the bankruptcy by a deputy collector of internal revenue from these books and from records in the office of the bankrupts' attorney with the assistance of the bookkeeper. The return was sworn to by one of the partners on January 6, 1931. The amount of gross sales indicated by this return, to wit, $62,921.96, was computed from the total bank deposits of $51,061.96, plus cash expenditures of $800 for advertising and $11,060 for salaries of partners and clerks.

It is especially significant that the books of account showed that $58,375.49 of the total purchases of $87,274.52 in 1929 were made in the four months preceding bankruptcy. During the same period the bank deposits aggregated only $14,481.31, and the gross receipts computed the same way as in the income tax return amounted to approximately $23,434.54. Thus, restricting our consideration simply to purchases in these four months, at least $35,000 worth of this new merchandise should have remained in the stores; while two appraisers testified that of the $11,365.30 worth of goods which they valued, only 20 per cent. had been purchased within a year, the balance being one to ten years old. There was also evidence that there were 600 to 700 empty boxes, particularly shoe boxes, on the shelves in the stores, after articles on the tables had been replaced in proper boxes.

On their behalf, the defendants offered the evidence of several witnesses who valued the stocks of goods which came into the hands of the trustee at various sums, ranging from $14,000 to $30,000. Some of them said that there were not as many empty boxes on the shelves as the appraisers had testified. In addition, the bookkeeper gave testimony tending to show that the amount of gross receipts during the year 1929 taken by the government in its conclusions was inaccurate. She said that there were many other cash expenditures which should have been taken into consideration, such as freight charges of $1,200 to $1,800, rent of $5,700 per year for the two stores, salaries of ten or twelve extra clerks at $2.50 to $3 per day employed on Saturdays during holiday seasons and during six or seven special sales held in 1929, a $50 per week salary for a sales promoter during the sales, and other incidental sales expenses, as well as the cost of lights and telephones; and that during the last two or three months of 1929 many claims for the price of merchandise bought by defendants were pressed by lawyers, and that these claims were paid in cash. She also said that household expenses were higher than ordinary living expenses, that she sometimes sent money to her mother, that both defendants went on trips for which the expenses were paid out of cash from the business, no record being made of withdrawals, and that the defendants lost money at poker on those trips; that in order to meet chain store competition much merchandise had to be sold for less than cost during the latter months of 1929. She denied that $87,000 worth of merchandise had been purchased in 1929, or that $58,000, as shown by the journal and ledger, had been bought during the last four months of that year, saying that these goods were purchased earlier in the year and that some of the $87,000 worth had been purchased in the year previous, purchases being charged on the books "as of" the time when the purchase price became due.

The defendants contend that the evidence of the government at best went merely to show an unexplained shortage of merchandise, and was insufficient to take the case to the jury since it did not exclude every reasonable hypothesis except that of guilt; and, secondly, that even if the evidence unexplained was substantial, nevertheless a verdict should have been directed for the defendants after the uncontradicted explanations of the bookkeeper had been received.

We do not think that these arguments should prevail. The unexplained shrinkage was without doubt the heart of the government's case in chief, and wherever such a circumstance is disclosed, the seeming failure of a bankrupt to surrender all of his property for the benefit of the creditors very reasonably gives rise to the inference that he is endeavoring fraudulently to save something

from the wreck of his business for his own benefit at the expense of those to whom it rightfully belongs. In this case there were also other circumstances by which that inference was supported. The failure to keep, or at least to produce, adequate books of account in a business of considerable volume and complexity from which the history of the business could have been easily ascertained was highly significant. Then, too, the purchase of large amounts of merchandise during the four months immediately preceding bankruptcy, while the business, according to the bookkeeper's testimony, was steadily growing worse; the age of the goods found by the appraisers, of which only 20 per cent. despite the large recent purchases were new, and the many empty boxes kept upon the shelves—were all circumstances indicative of a purpose to realize upon the defendants' remaining credit and apparent solvency, and of the actual concealment of goods or other proceeds from the trustee when the bankruptcy occurred. Cases of a similar character, but varying somewhat in detail, are described in Frieden v. U. S. (C. C. A.) 5 F.(2d) 556; Arine v. U. S. (C. C. A.) 10 F.(2d) 778; Kelly v. U. S. (C. C. A.) 47 F.(2d) 122; Paszkiewicz v. U. S. (C. C. A.) 3 F.(2d) 272.

■ The explanation offered on behalf of the defendants was directed principally at the incorrectness of the figures upon which the government's case was based, and raised a pure question of fact. It may well be, as the bookkeeper attempted to show, that the expenses of the business actually exceeded those allowed in the income tax return, and it is possible that the dates in the records indicating large purchases on the eve of bankruptcy were intended to record the items when the bills for the goods fell due. But this evidence was quite vague and uncertain, the amounts of large cash payments claimed to have been made were not given, check books and other documentary evidence were lacking, and the whole defense in this respect rested upon the testimony of the wife of one of the defendants, a deeply interested witness, without corroboration, such as might easily have been secured, for instance as to the dates of shipments and dates of payment for the goods which the government charges were received shortly before the petition in bankruptcy was filed. In this situation, it is impossible to say that the explanation offered by the defendants was so clear and convincing that the district judge should have instructed the jury to accept it as true. As was said in Crumpton v. U. S., 138 U. S. 361, 363, 11 S. Ct. 355, 356, 34 L. Ed. 958, a murder case in which the conviction was based on circumstantial evidence that the defendant attempted to meet: "The weight of this evidence, and the extent to which it was contradicted or explained away by witnesses on behalf of the defendant, were questions exclusively for the jury, and not reviewable upon writ of error."

The district judge in his charge in the pending case put the issue fairly before the jury. After summing up the evidence on both sides and pointing out the reasonable inference to be drawn therefrom if it should be believed, he cautioned the jury that they should not convict the defendants merely because they had practiced faulty or unsuccessful business methods, or had failed to keep adequate books of account, or to testify in their own behalf, but that they should be acquitted unless the jury, giving the defendants the benefit of the presumption of innocence, should be satisfied beyond a reasonable doubt that they had fraudulently concealed assets during the months preceding bankruptcy and had kept them concealed from the trustee in bankruptcy after he was elected.

Finding no errors in the ruling of the District Court, the judgment is affirmed.