### UNITED STATES v. TATCHER.
No. 7965.

District Court, E. D. Pennsylvania.
March 9, 1942.

660

Gerald A. Gleeson, U. S. Atty., and James P. McCormick, Asst. U. S. Atty., both of Philadelphia, Pa., for plaintiff.

William N. Nitzberg, of Philadelphia, Pa., for defendant.

KALODNER, District Judge.

The defendant, Ernest Tatcher, is one of two partners indicted on a charge of concealing property of a bankrupt estate from the trustee.

This is the defendant's second trial. At the previous trial the defendant demurred to the evidence; the demurrer was overruled, and the defendant was adjudged guilty and sentenced to imprisonment. The United States Circuit Court of Appeals of this Circuit reversed the judgment (Tatcher v. United States, 3 Cir., 107 F.2d 316) on the single ground that the government had not joined in the demurrer, and remanded the cause to the District Court with directions to order a new trial.

At the second trial, upon conclusion of the government's case, the defendant demurred; the government joined in the demurrer; and, in accordance with the procedure prescribed by the United States Circuit Court of Appeals in Tatcher v. United States, supra, I discharged the jury and the duty is now upon me to determine the innocence or guilt of the defendant.

The testimony discloses that the defendant and a partner, Raymond W. Blank —trading as the Keystone Flat Glass Company—were engaged in the glass business for several years prior to the filing of an involuntary petition in bankruptcy against the company on August 17, 1936. On August 19, 1936, one George Miller was appointed temporary receiver, and the appointment was made permanent on September 2, 1936. Tatcher and Blank were adjudicated bankrupts on September 9, 1936. On October 19, 1936, Miller was appointed trustee and thereafter duly qualified. The indictment against the defendant and his partner was found on August 31, 1938, and was based upon the alleged concealment of some $13,-000 worth of merchandise and other property from the trustee in bankruptcy as of October 19, 1936.

The bankrupt estate listed assets in its schedules in the amount of $286 and the property thus listed was duly turned over to the receiver.

According to the testimony, the bankrupts had an inventory of $5,880.96 on January 1, 1936. It further appears that the bankrupts made purchases of merchandise of $16,062.-47 between January 1, 1936 and the end of May, 1936, and that sales during this period totaled $9,039.37. There were no book or ledger records of purchases or sales after May, 1936.

As previously stated, merchandise on hand in September, 1936, was valued by the bankrupts' appraisers at $286, as listed in the bankrupts' schedules. There is no dispute as to this figure.

Analyzing briefly the situation presented by the foregoing, we find:

(1) That the purchases of........ $16,062.47
    Exceeded sales of............. 9,039.37

    By ..................................... $ 7,023.10
(2) That since the inventory on January 1,
    1936 amounted to ........................ 5,880.96

    The merchandise on hand at the
    end of May, 1936 should have been $12,904.06
(3) That since the merchandise on hand
    was only ............................... 286.00

    There was a discrepancy in the
    merchandise account of............ $12,618.06

In connection with the statement that purchases during January to May, inclusive, 1936, totaled $16,062.47 it should be noted that the *books* of the bankrupts listed purchases during that period of only $11,503.18. The balance of purchases of $4,559.29 was only disclosed by *proofs of claim* filed by creditors. It is especially noteworthy that all of these unlisted purchases of $4,559.-29 were made during the month of May, 1936.

The following monthly record of sales and purchases *as disclosed by the books and proofs of claim* is highly illuminating:

| Year 1936 | Sales | Purchases Entered on Books | Additional Purchases Established by Proofs of Claim |
|---|---|---|---|
| January | $1922.55 | $ 2137.38 | ........ |
| February | 1400.09 | 2092.16 | ........ |
| March | 2797.62 | 1674.74 | ........ |
| April | 2174.16 | 2162.99 | ........ |
| May | 744.95 | 3435.91* | $4559.29* |
| TOTALS | $9039.37 | $11,503.18 | $4559.29 |

(*) Total May Purchases $7995.20.

I have set forth in columnar form the January-to-May sales and purchases because three very significant facts are thereby disclosed in striking manner:

(1) That sales and purchases were on an almost even keel during January, February, March and April—purchases totaled $8,067.-27 while sales totaled $8,294.42.

(2) That while the bankrupts made total purchases of $7,995.20 during May, 1936, only $3,435.91 of the purchases were entered on the books, while the balance of $4,-559.29 *was only ascertained after the filing of proofs of claim* by creditors.

(3) That while the purchases and sales were in virtual balance for the first four months of 1936, in May purchases were more than ten times sales—indeed, the May purchases of $7,995.20 almost equalled total purchases of $8,067.27 during the preceding four months.

The preceding breakdown of sales and purchases, and the disclosure by the testimony that there was a discrepancy in the merchandise account of $12,618.06, brings me to the next phase of this case—the cost of the merchandise sold by the bankrupts.

In the instant trial, the government offered testimony as to the cost of the merchandise sold. It did not do so at the first trial. While the Circuit Court of Appeals reversed the judgment of guilty at the first trial, because of procedural error, it specifically pointed out that the government's failure to present testimony as to the cost of the merchandise sold was a fatal defect in its case.

Said the court (Tatcher v. United States, supra, 107 F.2d page 317):

"The Government contends that these figures establish a discrepancy in the merchandise account of over $12,000, which, it says, must necessarily represent merchandise which the bankrupts had on hand at the time of bankruptcy but concealed from the trustee. All that the Government proved by this evidence, however, was that the proceeds of the sale of merchandise in 1936 plus the merchandise delivered to the trustee were less than the cost of the merchandise which the firm had on hand during that year. There was no evidence as to the cost of the merchandise sold or as to how much of it was sold.

"The Government's evidence did not exclude the possibility that the bankrupts sold all their merchandise at a fraction of its cost and that there was no actual shortage in merchandise at all. Had there been testimony as to the cost of the merchandise sold the court would have had evidence which would have enabled it to subtract the cost of the goods sold from the cost of the goods purchased and on hand and thus determine what portion of the merchandise originally in the possession of the bankrupts should have been on hand at the time of bankruptcy. In the absence of such evidence, however, and of any other evidence of concealment, the Government failed to establish a prima facie case. In re A. H. Kaplan, Inc., D.C., 9 F.Supp. 984, affirmed Einhorn v. Kaplan, 3 Cir., 75 F.2d 763."

Now, as to the testimony presented in the instant trial relative to the cost of merchandise sold:

W. J. Miller, a certified public accountant and agent of the Federal Bureau of Investi-

gation, who made an examination and analysis of the accounts receivable and accounts payable ledger, the general ledger, and cash book of the bankrupt estate, testified that the cost of sales in 1935 was 75.75%, plus freight.

John J. Mulahy, an accountant, who made an examination of the books and records of the bankrupts, testified that the defendant's gross profit on merchandise sold was 37.8% in 1934, and 29.16% in 1935.

E. J. Chartres, an agent of the Federal Bureau of Investigation, testified that in a conversation which he had with the defendant in March, 1938, the defendant stated that he had always sold his merchandise at from 8 to 20% profit. The defendant incidentally told Chartres that he attributed the discrepancy in the merchandise to (1) breakage, (2) waste, and (3) thefts by employees in the amount of $236. The defendant also told the F. B. I. agent that the breakage amounted to about $1,000. He made no estimate as to the item of "waste".

Blank, the defendant's partner and a salesman for the company, testified that he "always sold at a profit". Said Blank: "I don't think we ever sold at less than cost."

Wm. O. Tatcher, a brother of the defendant, who was also in the glass business and who made purchases from time to time from the bankrupts, testified that he never made any purchases at less than cost. Incidentally, this witness testified that he purchased over $687 of the $744.95 of merchandise sold by the bankrupt estate in May, 1936.

It may be here pointed out that the defendant Tatcher, in his conversation with Agent Chartres in 1938, testified that he ceased keeping books at the end of May, 1936, because his employees had left him; that thereafter sales were noted on slips. In connection with this statement that sales were made after May, 1936, Blank testified that he sold merchandise up to the time of bankruptcy; that he drew a salary of from forty to fifty dollars a week from the business up to the date of bankruptcy, and that his car and its upkeep was paid for by the business. Blank testified also that he was the "outside man" and that the defendant was the "inside man" in the business; that as far as he knew no goods were removed from the premises of the bankrupt estate.

The testimony above discussed as to the cost of sales thus fills the gap in the government's case cited in Tatcher v. United States, supra.

The defendant stresses the two-fold contention, which he also made at the first trial, that the government had failed to establish beyond a reasonable doubt (1) that the bankrupt sold the merchandise on hand at the beginning of 1936 and that purchased during the period from January to May, inclusive, 1936, at a net profit; (2) that the defendant concealed assets which the trustee was entitled to receive on the date of his appointment.

As to the first of these contentions:

The accountant, Mulahy, testified that his analysis of the defendant's business in 1934 showed that the defendant realized a profit of 37.8% on sales of $26,000 and that he realized a profit of 29.16% in 1935 on sales of $34,500.

Taking into consideration this testimony, and the testimony of the defendant's partner Blank, that the bankrupts never sold at less than cost and "always sold at a profit", together with the defendant's own statement to Agent Chartres that sales were at 8 to 20% profit, I can come to no other conclusion than that the merchandise purchased by the bankrupts was sold at more than its cost.

The government's testimony then places the defendant in this position:

He had on hand $5,580 of merchandise at the beginning of 1936; purchases and sales during January to April, inclusive, 1936, were about equal; purchases of $7,795 in May, 1936, exceeded sales of $745 that month by $7,250.

Even omitting from consideration the defendant's operations prior to May, 1936, the stark realistic facts remain that his purchases exceeded sales that month by $7,250; that of the $745 sales he made that month his own brother purchased $687 at cost, and that he failed to record $4,559 of his May purchases on his books, and that there appears to be no explanation or record of any kind with reference to any possible disposition of the $7,250 excess merchandise.

Now, as to the effect of this testimony:

█ As was stated in Tatcher v. United States, supra, 107 F.2d page 317: "By his demurrer to the evidence the appellant waived all objections to the admissibility of the evidence and admitted all the facts which the evidence tended to prove *as well as all inferences reasonably deducible therefrom.* * * * *The sole remaining inquiry was whether the evidence and the*

*proper inferences therefrom would support a verdict of guilty. * * * "* (Emphasis supplied.)

With my finding of fact under the evidence that the defendant did not sell his merchandise below cost, and with my further finding of fact that at the end of May, 1936, there was a shortage in the merchandise account of $12,618, I come to the final two-fold question—Did the government establish that the defendant had assets which he was required to turn over to the trustee and did he conceal those assets from the trustee?

That question must be answered in the affirmative, and I find as a fact that the defendant had in his possession and concealed from the trustee merchandise in the amount of $12,618.06 on October 19, 1936, as charged in the indictment.

■■ It is well settled that concealment may be established by circumstantial evidence. The following statement in Stern v. United States, 3 Cir., 193 F. 888, 891, is strikingly applicable to the instant case: "We may assume from our knowledge of human affairs and human conduct, that the offenses denounced by the bankrupt law and set forth in the indictments are not such as can be readily proved by direct testimony. The very description of the offense indicates that this must be true. 'Concealment' is the very essence of the conduct denounced by the law, and a court and jury in administering this law are not dealing with open and flagrant acts of the defendant, but with the fact of concealment itself. The evidence, therefore, in such cases must accommodate itself to the issue to be tried, and be such as in the practical affairs of life tends to produce belief and conviction in the minds of those to whom such evidence is addressed. In other words, the evidence must in general be largely, if not wholly, circumstantial, and be in large measure governed by what the trial court in its judicial discretion shall consider its appropriateness to the issue presented in a particular case. It must be 'evidence which inferentially proves the principal fact by establishing a condition of surrounding and limiting circumstances whose existence is a premise from which the existence of the principal fact may be concluded by the necessary laws of reasoning.' In a criminal case, of course, such surrounding conditions and circumstances must be such as are inconsistent with the hypothesis of the innocence of the party accused."

In Kelly v. United States, 5 Cir., 47 F.2d 122, 125, the court held: " * * * evidence indicated that there was a shortage of assets amounting to more than $16,000, which was not explained by appellant's books or any other evidence. The alleged concealment of money and merchandise was capable of being proved by circumstantial as well as by direct evidence. One's possession shortly prior to a given date of substantial amounts of money and merchandise which he did not then disclose, though required by law to do so if he then had those assets, and the absence of evidence that any of that money or merchandise was wasted or dissipated or that he involuntarily lost control of any of it, are circumstances which properly may be considered in determining whether he did or did not conceal all or some of those assets at and after that time. If the evidence had shown that, on the day before the filing of the voluntary bankruptcy petition, the appellant had a substantial sum of money and merchandise amounting to greatly more than $8,000, that his bankruptcy schedules filed with his petition indicated that he had no money and only $8,000 worth of merchandise, and that there had been an absence of any explanation of the discrepancy between what he had had on one day and what he disclosed the next day, it hardly would have been contended that there was no basis for an inference that after his bankruptcy the appellant was concealing from his trustee money and merchandise. The difference between the suggested state of evidence and the above-indicated state of evidence in the trial is that the former shows a more recent possession of unaccounted for assets than was shown by the latter, which, however, showed such a possession by appellant of substantial amounts of unaccounted for money and merchandise so short a time prior to his bankruptcy as, in the absence of any explanation as to what became of those assets, reasonably might be considered to indicate that his possession or control thereof continued after bankruptcy."

It should be noted that the accounting period existing in Kelly v. United States, supra, was approximately one year.

In Kanner v. United States, 2 Cir., 21 F.2d 285, 287, the defendants were forced into involuntary bankruptcy on June 12, 1922, and they were indicted on June 1, 1923, almost a year later, on the charge of concealment of assets from their trustees in bankruptcy. Said the court in that case:

"The proof itself was inferential, and did not disclose what pieces of dress goods were concealed, or where they were concealed, or whether they had not been turned into cash, which was concealed. No one but the defendants knew what the concealed property was, or in what form it was, or what they had done with it. The fact of concealment was inferable from the large discrepancy between the merchandise which the books showed to be on hand and what was actually found, coupled with the defendants' suspicious conduct, for example, in camouflaging the stock on their shelves and withdrawing money on the eve of bankruptcy. Such a discrepancy has been recognized as a link in the chain of proof of concealment in Stern v. United States [3 Cir.], 193 F. 888, 892; United States v. Greenbaum, D.C., 252 F. 259, 265; Frieden v. United States [4 Cir.], 5 F.2d 556."

Finally, Cohen et al. v. United States, 4 Cir., 67 F.2d 449, 450, 451, effectively disposes of the defendant's contention that the mere establishment of an unexplained shortage of merchandise is insufficient to warrant a verdict of guilty. Said the court in that case:

"The defendants contend that the evidence of the government at best went merely to show an unexplained shortage of merchandise, and was insufficient to take the case to the jury since it did not exclude every reasonable hypothesis except that of guilt; and, secondly, that even if the evidence unexplained was substantial, nevertheless a verdict should have been directed for the defendants after the uncontradicted explanations of the bookkeeper had been received.

"We do not think that these arguments should prevail. The unexplained shrinkage was without doubt the heart of the government's case in chief, and wherever such a circumstance is disclosed, the seeming failure of a bankrupt to surrender all of his property for the benefit of the creditors very reasonably gives rise to the inference that he is endeavoring fraudulently to save something from the wreck of his business for his own benefit at the expense of those to whom it rightfully belongs. In this case there were also other circumstances by which that inference was supported. The failure to keep, or at least to produce, adequate books of account in a business of considerable volume and complexity from which the history of the business could have been easily ascertained was highly significant. Then, too, the purchase of large amounts of merchandise during the four months immediately preceding bankruptcy, while the business, according to the bookkeeper's testimony, was steadily growing worse; the age of the goods found by the appraisers, of which only 20 per cent. despite the large recent purchases were new, and the many empty boxes kept upon the shelves—were all circumstances indicative of a purpose to realize upon the defendants' remaining credit and apparent solvency, and of the actual concealment of goods or other proceeds from the trustee when the bankruptcy occurred. Cases of a similar character, but varying somewhat in detail, are described in Frieden v. United States [4 Cir.], 5 F.2d 556; Arine v. United States [9 Cir.], 10 F.2d 778; Kelly v. United States [5 Cir.], 47 F.2d 122; Paszkiewicz v. United States [7 Cir.], 3 F.2d 272."

As previously mentioned, the defendant has laid great stress upon the fact that some four and one-half months elapsed between the end of May, 1936, and October 19, 1936, the date of the trustee's appointment and qualification, and that the government offered no direct evidence that the unaccounted for merchandise, or the proceeds thereof, was in the hands of the bankrupt on October 19, 1936.

In Marcus et al. v. United States, 3 Cir., 20 F.2d 454, the concealment took place between May 7 and August 28, 1924, and the trustee was not elected and qualified until June 15, 1925, almost ten months later. In that case a conviction for concealment was sustained despite the passage of the ten-month period.

Counsel for the defendant has cited several cases in other circuits as contra to the general principle enunciated by the cases which I have cited. They can all be distinguished, but in so far as their language seems at variance with the above-cited cases, I am not in accord with them.

Defendant has also cited United States v. Schireson, 3 Cir., 1940, 116 F.2d 881, 132 A.L.R. 1157. That case was entirely different on its facts from the instant case, as a reading of the court's opinion will disclose.

In accordance with what has been stated, I adjudge the defendant guilty and direct him to appear on April 8, 1942, at 11 A.M., for imposition of sentence.