REA CONSTRUCTION COMPANY and Ætna Casualty and Surety Company, Appellants,

v.

B. B. McCORMICK & SONS, Inc., Appellee.

No. 16929.

United States Court of Appeals Fifth Circuit.

May 13, 1958.

J. Velman Keen, A. Frank O'Kelley, Charles H. Spitz, Keen, O'Kelley & Spitz, Tallahassee, Fla., for appellants.

William A. O'Bryan, Ausley & Ausley, Tallahassee, Fla., Mark Hulsey, Jr., Glickstein, Crenshaw & Glickstein, Jacksonville, Fla., for appellee.

Before RIVES, BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The question here is whether the District Court in a non-jury trial properly denied recovery to Contractor [1] for items claimed to have been the responsibility of Subcontractor [2] on the ground that the contract was ambiguous and unclear, thus allowing receipt and decisive consideration of parol evidence. That is the crucial issue for once it is determined that the contract was ambiguous, Contractor concedes that it cannot overturn the consequent fact findings on interpretation which come here with the buckler and shield of F.R.C.P. 52(a), 28 U.S.C.A.

The immediate problem concerns the sand-shell backfill of that portion of trenches dug for the installation of the drainage system which traversed paved runways or taxiways at NAAS, Corry Field, Pensacola, Florida.

The prime contract was between the United States Navy and Contractor. It covered the general rehabilitation of two contiguous East and West fields, the runway pattern of which resembled: XX. Runways and taxiways of this war-weary field were inadequate for planes of the jet-age primarily because of poor drainage of the field occasioned by an insufficient drainage system and grade of paved areas and adjacent turfed ground. The contract was for the "resurfacing, grading and storm drainage" of the field. It covered the necessary regrading, removal of the old drainage system, installation of a new drainage system, addition at extensive areas specified of a hot mix sand-asphalt leveling course to bring runways and taxiways up to grade,

---

1. Rea Construction Company. In this Miller Act, 40 U.S.C.A. § 270,* action, it is joined by its surety, Aetna Casualty and Surety Company.

* Now 40 U.S.C.A. § 270a note.

2. B. B. McCormick & Sons, Inc.

the addition of a two-inch hot mix asphaltic concrete wearing course on the runways and some taxiways, the addition of a bituminous sand-seal coat on some taxiways, installation of runway lights, painting and marking the fields, and seeding and fertilizing some 263 acres of turfed area. The contract bid price was approximately $1,500,000. For that part undertaken by Subcontractor, the bid was approximately $414,000.

A description in a broad general way of the work to be done serves to put the specific problem of the subcontract in its context. The runways and taxiways were not level. They were dished out and uneven. As water collected and remained in these low spots, this aggravated the problem of general inadequate drainage and caused further subsidence, settling or destruction of the surfaces. To remedy this, the turfed area was to be lowered while the surfaces of taxiways and runways were to be raised considerably to conform to new and higher grades.

To increase elevation of the runways-taxiways and to provide a smooth continuous surface, the plans and specifications called for a leveling course to be applied on top of existing paved runways at variable thicknesses necessary to meet grade. Where the leveling course was 6 inches or less in thickness, sand-asphalt was required. Where it exceeds 6 inches in thickness, sand-shell, a 50/50 mixture of both, was called for. Sand-asphalt, as the name implies, was a hot mix of sand, aggregate and specified asphalt to be prepared and laid in a carefully prescribed manner. On the top of the added leveling course (of sand-shell or sand-as-

phalt as the case might be) or directly on the original top surface of the existing runways in areas where no leveling course was required to meet grade, a two-inch hot mix asphaltic concrete wearing course was prescribed. This too, was a hot mix of asphalt, aggregate, mineral cement and filler mixed, prepared and applied in accordance with meticulous specifications. As can readily be seen, this was essentially a road-building operation.

The plans also called for an extensive new drainage system consisting of an intricate pattern of subterranean concrete drainage pipe laid in trenches at prescribed sub-elevations. These drainage lines following the prescribed contour patterns were, of course, run under both paved and turfed areas. To lay the pipe under paved runways-taxiways, it was therefore necessary to cut the existing paved surface, dig the trench, install the pipe, backfill the trench to the bottom of the the previous pavement slab, restore the pavement surface or somehow fill the void up to the surrounding top surface of the existing pavement on which to put the leveling course, if required, and the asphaltic concrete wearing course.

Our controversy narrows down to whether the space [3] formerly occupied by the pre-existing paved slab thus removed to cut the trench was a "backfill" to be done by Subcontractor as a part of his contract for installation of the drainage system, or was, on the other hand, part of the work reserved by Contractor.

The Contractor contends that since the written agreement [4] prescribed that Subcontractor would, among other things

---

3. There was controversy below, since resolved adversely to the Contractor by the Trial Court's implied findings, whether, in addition to this space, Subcontractor had sufficiently backfilled up to the top of the subgrade.

4. This was on a printed form regularly used by Contractor. The scope of the work was described in this language:
   "The said Sub-Contractor hereby agrees to furnish all materials; All re-

quired shop and erection drawings; All required samples; All equipment together with all labor under supervision satisfactory to the Engineer, Owner, and the Contractor, to complete the following part or parts of the work of the Contract in all respects as is therein required of the Contractor, and all work incidental thereto, namely:
   *     *     *     *     *
   "(3) The complete drainage system with the Contractor supplying free of

not involved here, furnish all materials, labor and equipment necessary to "complete * * * in all respects as is therein required of the Contractor * * * all work incidental * * *" to "(3) The complete drainage system * * *" less specified items, this had the effect of making Subcontractor obliged to do all that which the specifications, Section 5 "Drainage System," outlined in detail. Specifically, Contractor asserts, these specifications prescribed the type of backfill [5] required and put the responsibility, formerly on Contractor as between it and the Navy, on the shoulders of Subcontractor.

■ While the use of parol evidence is not permitted to *create* ambiguities, Knabb v. Reconstruction Finance Corp., 144 Fla. 110, 197 So. 707, 715; Highway Construction Co. v. City of Miami, 5 Cir., 126 F.2d 777; Restatement, Contracts, §§ 230, 231, so that such uncertainties may thereafter be eradicated by more of the same kind of evidence, the process of interpreting a series of written documents as complex as the intricate assortment of plans, drawings and specifications covering a major industrial construction project is not merely the simple task of picking out and then applying words literally in their normal connotation. There is a preliminary matter of understanding at least enough of the setting to have assurance that the words employed by parties in a technical undertaking are read in the light of that activity. Baker v. Nason, 5 Cir., 236 F.2d 483, 491; Petroleum Financial Corp. v. Cockburn, 5 Cir., 241 F.2d 312, 317; Fidelity-Phenix Fire Insurance Co. v. Farm Air Service, Inc., 5 Cir., 253 F. 2d 407. With this approach, and in the absence of a specific definition of some terms, notably "trench" and "subgrade," we think the District Court was right in concluding that this contract was sufficiently unclear as to warrant the receipt of evidence of the negotiations, contemporaneous understandings and the subsequent actions of the parties which stamp their own construction on the agreement.

Consequently we must look at something more than the bare simple words of § 5–05(c), note 5, *supra*, treated by Contractor as necessarily decisive: "The remainder of the trench shall be backfilled with sand-shell as specified in the section 'Sand-Shell Leveling Course.'"

charge to the Sub-Contractor, all of the original requirements ' of concrete pipe (i.e. any breakage or wastage of pipe by the Sub-Contractor will be replaced by him at his expense) and all diaper bands, rubber gaskets, and lubricating cement (the Sub-Contractor will furnish all mortar materials).

"(4) All pavement removal except the sand-shell weep holes (in conjunction with pavement removal, the Contractor will make all asphaltic concrete repairs to taxiways and runways necessary to keep the fields operational after they have been cut by the Sub-Contractor to place, remove, or replace drainage items)."

5. To pinpoint the dispute, we have italicized the key provisions of the specifications.

Specifications, Section 5–05(c) "Backfilling.—After the bedding has been prepared and the pipe installed, selected material from the excavation * * * shall be placed alongside the pipe in layers not exceeding six (6) inches in depth. * * * Each layer shall be thoroughly compacted by tampering with mechanical rammers, or by hand tamping with heavy iron tampers * *. *In paved areas the above method of backfill shall be continued until the fill reaches the top of the subgrade. The remainder of the trench shall be backfilled with sand-shell as specified in the section 'Sand-Shell Leveling Course.'* In turfed areas the above method of backfill shall be continued until the fill has reached an elevation 12 inches above the top of the pipe and the remainder of the trench shall be backfilled and thoroughly compacted in layers not exceeding eight (8) inches. Backfill under paved areas and 5 feet adjacent thereto shall be compacted to not less than 95 percent of maximum density * * *. Backfill over and around the pipe and backfill around and adjacent to all drainage structures, except as specified above, shall be compacted to not less than 90 percent of maximum density of optimum moisture." (Italics supplied.)

A consideration of the setting reveals that this did not have a fixed meaning based on ordinary usage.

There was, first, the acknowledged fact that under the requirement of the prime contract that one of the two fields remain operational at all times, *some* work had to be done within the void resulting from the removal of the former slab. To the extent that this was "asphaltic concrete repairs to taxiways and runways" this was the admitted responsibility of Contractor by the precise terms of subparagraph (4) of the subcontract, note 4, *supra*. Therefore as to the *top* surface of all of such cuts in the East [6] field, it was recognized that Subcontractor had, and would have, no obligation. Immediately there was presented the practical problem which might be broadly stated: Since the top surface of the temporary repair to permit operational use had to be level with the cut edges of existing pavement, how thick was the temporary top layer to be? Whatever [7] it was, it automatically reduced by like amount the thickness of the underlying material to fill that void. That was a practicable problem which practical people concerned with the execution of a practical and vast industrial project could solve in a practical way.

Comparable to this problem was the nature of the material required to fill this void depending on the particular location of a given trench cut. For example, where the present top surface was to have a sand-seal only (i. e., no wearing course), the specifications required that the top 6 inches be sand-asphalt.[8] Or where the trench cut was made in an area of the runway in which the additional leveling course required was less than 6 inches in thickness, the material under the subsequent wearing course was to be sand-asphalt, not sand-shell. In others where the leveling course to be added exceeded 6 inches, the underlying material would be sand-shell. These examples illustrate the practical problems presented. For with the careful preplanned coordinated activity so essential to modern construction methods, the work could hardly proceed with much efficiency if the nature of the underlying material for a given trench-cut might vary from foot to foot depending on the peculiar elevation or grade of that area. After all, these were primarily matters relating to the paving operation, not the drainage system. And they were so treated by Contractor who obtained, either before or after the prime contract was let, permission from the Navy to use sand-asphalt rather than the cheaper material sand-shell.

One very practical way to solve this problem was to come to a practical understanding by which it was agreed in effect that the reference in Section 5–05 (c) to "The remainder of the trench" should never include that portion previously occupied by the permanent paved surface. This defined backfilling in terms that limited Subcontractor's prac-

---

6. Under the work schedule approved and followed, no work was done in the West field until after the drainage system was installed in the East field, the trenches backfilled and the "void" temporarily filled and a temporary surface wearing course applied on the top. Once work commenced in the West field, it continued until completed without the necessity for any temporary "asphaltic concrete repairs" to keep that field operational.

7. The final permanent wearing course was to be two inches thick.

8. See § 7. "Pavement Removal. § 7–02. *Removal of Pavement for Storm Drainage.* Where existing storm drainage pipes to be removed, or new storm drainage pipe is placed under the existing pavement, the pavement shall be cut along straight and perpendicular lines parallel to the center line of the pipe. * * *

"(b) where pipe is placed or removed under taxiways that are to receive the bituminous seal coat only, the trench shall be backfilled to the bottom of the existing pavement in accordance with the Section 'Drainage System'; the top six (6) inches shall be repaved, in 2 inch layers, with the same material used for the sand-asphalt leveling course and shall be placed and compacted in accordance with the Section 'Hot Bituminous Sand-Asphalt Leveling Course.'"

tical responsibility up to the bottom of the existing pavement and, at the same time, gave a practical definition to the term "top of the subgrade," note 5, *supra*, which was nowhere else defined with precision.

Once the Court saw that in this realistic setting the bare-bones language of the specifications presented uncertainties and doubts, it was permissible to receive and apply what the parties contemporanously said would be the meaning. As earlier stated, Contractor does not really challenge this evidence or the Court's findings once that hurdle is jumped. We need, therefore, only briefly point out that there was adequate testimony, in many respects corroborated by that coming from the top executives of the Contractor who engaged in the negotiations, mutual exchange of data, preliminary proposed subcontract bid estimates, and the like, that in calculating the amount of the Subcontractor's bid, which Contractor was anxious to reduce, it was agreed that Subcontractor would have no responsibility for filling this void in the previous pavement or the use of sand-shell as backfill in any such spaces.

There was likewise an abundance of persuasive testimony which the Court could, and presumably did, credit to establish that this was the practical construction put on the agreement by the parties. Without urging it in a technical sense, i. e., as a contract failure to comply with the condition precedent, Subcontractor's proof showed that at no time did Contractor ever give notice to Subcontractor that it was in default with respect to this and that if not remedied, Contractor would proceed to do the work.[9] From this silence and the undisputed fact that while the work progressed on the West field, regular, substantial progress payments were made to Subcontractor without deductions or claimed credits, (see note 10, *infra*) the Court could infer that Contractor assumed this work to have been its responsibility. Later, after the job was all completed and there were the usual tag ends open for adjustment, Contractor's executives in arranging for a conference which was subsequently held, listed seven or eight things on the agenda of disputed items. This major matter involving over $37,000 was not mentioned directly or indirectly. Also, the temporary work on the East field was arranged by an agreement with another subcontractor (Faulk & Coleman) by a direct contract in Contractor's name. On the West field, much of this disputed work was done long after Subcontractor had completed all of its other work and its equipment had long since left the job site.

We think that the District Court had ample warrant for concluding that there were uncertainties in this subcontract. He had a full understanding and appreciation of the complex problems presented, not only in this specific case, but in related controversies growing out of disputes between Faulk & Coleman and McCormick as to other work subcontracted by it, all of which were tied together. While each dispute was carefully segregated in the trial and record, the Court

9. "Article 8—Should the Sub-Contractor at any time refuse or neglect to supply * * * a sufficient quantity of materials * * * or fail in any respect to prosecute the work covered by this Sub-Contract, * * * or fail in the performance of or should he violate any of the agreements herein contained, the Contractor may, at his option, after forty-eight hours written notice to the Sub-Contractor, provide any such labor and materials, and deduct the costs thereof from any money then due or thereafter to come due the Sub-Contractor under this Sub-Contract; or the Contractor may, at his option, terminate the employment of the Sub-Contractor for the said work, and shall have the right to * * * take possession, for the purpose of completing the work included under this Sub-Contract, of all materials, tools and appliances thereon, and may employ any other person or persons to finish the work and provide the materials therefor; and in case of such discontinuance of the employment by the said Contractor, said Sub-Contractor shall not be entitled to receive any further payments under this Sub-Contract until the work shall be wholly finished * * *"

had an unusual familiarity with the practical problems presented in this large project. Once he concluded that there was this uncertainty, then receipt of this type of evidence was permissible. Glades County v. Detroit Fidelity & Surety Co., 5 Cir., 67 F.2d 449; Vans Agnew v. Fort Meyer Drainage Dist., 5 Cir., 69 F.2d 244; Bruce v. McClure, 5 Cir., 220 F.2d 330; Franklinville Realty Co., v. Arnold Construction Co., 5 Cir., 120 F.2d 144; Shouse v. Doane, 39 Fla. 95, 21 So. 807.

This means then that the District Court was authorized to find, as it did, that filling this void either with sand-shell or as Contractor for its own reasons decided to do it with sand-asphalt was the responsibility of Contractor, not the Subcontractor. It was proper, therefore, to reject the charge-backs made for the temporary and permanent work on the East field and all of that done on the West field. The judgment for the principal amount is therefore affirmed.

However, when it comes to the allowance of interest, we think the Court erred. Payment was not due [10] by Contractor to Subcontractor until Contractor had been paid by the Navy. There was no proof that this had been done prior to the time of the filing of the suit. Even more important, the Subcontractor was not entitled to its final payment until it furnished satisfactory proof that all claims of materialmen, laborers and suppliers had been paid. This record shows that, tried along with this controversy between Contractor and Subcontractor, was the very spirited dispute between Subcontractor and Faulk & Coleman in which Subcontractor was cast for a substantial sum of money. On the terms of

this contract, the payment was not due and interest is not recoverable prior to the date of the judgment. The judgment is therefore modified to allow interest from the date of the judgment only.

Affirmed in part and reversed and modified in part.

---

10. "Article 13—The said Contractor hereby agrees to pay to the said Sub-Contractor * * * the unit prices hereinafter stated * * *. Partial payments shall be paid by the Contractor to the Sub-Contractor as the work progresses, based upon estimates and certificates of the Engineer, 10% to be retained. Final payment shall be made within 10 days, after the completion of the work included in this Sub-Contract, and upon written acceptance of the Engineer, and full payment therefor by the Owner. All payments are contingent upon evidence that all claims for labor and material are paid prior to settlement between the parties hereto. * * *"