## DILWORTH v. BOOTHE.

### No. 6986.

Circuit Court of Appeals, Fifth Circuit.

March 14, 1934.

Mark McMahon, of Fort Worth, Tex., C. W. Trueheart, of Longview, Tex., and George Cannon, of San Antonio, Tex., for appellant.

Henry A. Hirshberg and Arthur W. Mueller, both of San Antonio, Tex., for appellee.

Before BRYAN, FOSTER, and SIBLEY, Circuit Judges.

FOSTER, Circuit Judge.

Coke Emory Dilworth was a member of a partnership conducting a private, unincorporated bank at Gonzales, Tex., under the style of the Dilworth Bank. The firm and its members were adjudicated bankrupt on a voluntary petition on June 23, 1931. Coke Dilworth applied for a discharge on June 14, 1932, and the petition was referred to the referee. Thereafter the trustee filed his opposition to the discharge, charging that the bankrupt had committed offenses punishable by imprisonment, by fraudulently concealing assets from his trustee and making a fraudulent and false oath in his bankruptcy proceedings. After a hearing before the referee he reported adversely to the bankrupt. On a review by the District Court the conclusions of the referee were approved, and

judgment was entered denying a discharge. This appeal followed.

The record discloses the following material facts: In the early part of 1931 Coke Dilworth was personally indebted to the Frost National Bank, of San Antonio, on notes in the sum of $85,000, and the Dilworth Bank was indebted to it on a note for $75,-000. The Frost National Bank requested security of Coke Dilworth. He went to his brother-in-law, H. L. Kokernot, apparently a man of considerable means, and requested assistance. The result was that certain mineral royalties owned by Coke Dilworth and a ranch known as the Wolf Ranch, owned by his wife, were deeded to the Kay Royalty Corporation, owned entirely by Kokernot, in the form of a sale, for respectively $110,000 and $50,000. The deed was properly recorded. The Kay Corporation executed a vendor's lien note for $160,000. Kokernot indorsed this note personally, it was pledged to the Frost National Bank as security for a now note executed by Coke Dilworth, in the same amount, and the pre-existing notes were canceled. The vendor's lien note was dated March 10, 1931, and was payable in three installments; $60,000, due in one year, $50,000 due in two years, and $50,000 due in three years, after date. It was contemplated that the revenues from the royalties would be sufficient to liquidate the note. As to this transaction Coke Dilworth testified that Kokernot assured him that he did not want to make any money out of the transaction and, knowing him, he took that to mean that when the Kay Corporation paid its obligation to the Frost National Bank, Kokernot would immediately transfer the ranch back to his wife and the royalties to him.

About a month prior to the filing of the voluntary petition, involuntary bankruptcy proceedings were begun in the same court against the Dilworth Bank and its members charging that the giving of the Kay Royalty note to the Frost National Bank was an act of bankruptcy as creating a preference.

Mr. Mark McMahon, a reputable and competent attorney, was employed by Coke Dilworth in his bankrupt proceedings. Together they went over the schedules which had been prepared. The schedules truthfully reflected the legal aspects of the royalty transaction, but did not mention any interest of the bankrupt in the royalties, except as to the vendor's lien note, which was surrendered. Mr. McMahon testified, in substance, as follows: Coke Dilworth complained that the royalties were not in the schedules and told him that they ought to be worth enough

to pay all the debts of the bank; that he had made a straight deed to the royalties, but they were pledged as collateral to pay $110,000 and were to go back to him. He insisted on their being put in the schedules. McMahon inquired as to whether the royalties were the same as those complained about in the involuntary petition, and was told that they were. McMahon had in mind not only Coke Dilworth, but also Kokernot, the bank, and the trustee. He did not think it would be fair to the other parties to put the royalties in the schedules. Everybody knew about the transaction, and he wanted to let the parties try to get together and not have any one prejudiced by a statement of the bankrupt. He advised Coke Dilworth that he had the right to file an amended schedule, and advised that the royalties be not included in the schedules until they had a conference with Kokernot, the bank, and the attorneys for the trustee when they were appointed. It was at his insistence and on his advice they were not included in the schedules. Later, he discussed the matter with the attorneys for Mr. Boothe, the trustee. Coke Dilworth testified that he talked to Mr. W. T. Miller, attorney for the trustee, about filing a supplemental schedule showing the ownership of the royalties in him but he (Dilworth) did not think it necessary as Everett Lawley (a member of the firm) had turned in some royalties after he had filed his schedules and made no amendment to his schedules. The testimony of McMahon and Coke Dilworth, the substance of which is above set out, is undisputed.

Later, the trustee entered into negotiations with the Frost National Bank and Kokernot about the royalties. It is not shown when these negotiations began except that the trustee testified it was long prior to their consummation. On November 17, 1931, the trustee was granted authority by the referee to enter into a compromise with regard to the royalties and concluded the transaction some time in December. As the result of this compromise, the trustee received all the stock of the Kay Royalties Corporation in full ownership, which carried full title to the royalties, Kokernot was released from his indorsement, and the rights of the Frost Bank were adjusted. The royalties were officially appraised in the bankruptcy proceedings at $95,000.

Coke Dilworth and the other members of the Dilworth Bank had been indicted in a state court for receiving deposits while the bank was insolvent. On April 25, 1932, they filed an application for a continuance in the

state court on the ground that certain named witnesses were absent and could not be procured in time for the trial. In this application Coke Dilworth said under oath that on May 2, 1931 (the date the bank closed), he owned the Kay royalties, which cost him $220,000; that the absent witnesses would testify that they were worth, on May 2, 1931, more than $500,000; that the title shown by the record to these royalties was in the Kay Royalty Corporation to secure an indorsement of H. L. Kokernot in the sum of $110,-000, but the actual ownership of them was in Coke Dilworth, subject only to such indebtedness.

The trustee testified that when he entered into the compromise he had no knowledge that Coke Dilworth was the owner of the royalties and he did not learn that fact until Coke Dilworth executed the application for a continuance in the state court. He further testified that on April 25, 1932, he had all the royalties in his possession as trustee; that he had seen the petition for involuntary bankruptcy, but did not remember its contents; that he did not accuse Kokernot or any others connected with the transaction of any fraud, and there was no question of making Kokernot stand any loss; that Kokernot had no objection to transfer the royalties to him so long as he did not lose anything in the transaction; that at all times since he had been trustee, whenever he desired any information, Coke Dilworth gladly furnished him with information about anything asked concerning the bank or his own individual estate.

Briefly stated, the specifications of the opposition that were sustained charged: (1) That the bankrupt concealed assets from his trustee by omitting from his schedules any mention of his equity in the royalties transferred to the Kay Royalty Corporation; (2) that he made a false oath in his bankruptcy proceedings by swearing to the schedules; and (3) that the concealment continued until the trustee learned of his equity in the royalties for the first time when the bankrupt executed the affidavit for a continuance of his criminal case in the state court.

There is a complete failure of proof as to the third specification. When the affidavit was made in the state court the trustee had been in possession of the royalties for about four months with both the legal and the equitable title. Property in the possession of the trustee is not concealed from him.

 The first and second specifications may be considered together. It may be assumed

that it was the duty of the bankrupt to surrender any equity, however slight, he may have had in the royalties, and to note it on his schedules. However, to bar his discharge, under the provisions of section 14 (b) (1) of the Bankruptcy Act, as amended by Act May 27, 1926, 11 USCA § 32 (b) (1), for having committed an offense punishable by imprisonment, to wit, concealment of assets from his trustee, it was necessary to show that it was done knowingly and fraudulently. Bankruptcy Act, § 29 (b), as amended by Act May 27, 1926, 11 USCA § 52 (b). If fraudulent intent in that respect is not shown, the charge of having made a false oath to the schedules falls with it. This is not a case of conspiracy or concealment begun before adjudication and continued thereafter. The bankrupt did not necessarily commit the offense of knowingly and fraudulently concealing assets from his trustee by merely omitting mention of them from his schedules. Ordinarily there can be no concealment from the trustee until he is appointed. Rachmil v. U. S. (C. C. A.) 43 F.(2d) 878. If, within a reasonable time after the trustee's appointment, the bankrupt makes a full disclosure to him so that the property may be reduced to possession, there is no fraudulent concealment. Fields v. Karter (C. C. A.) 115 F. 950; Humphries v. Nalley (C. C. A.) 269 F. 607. It may be presumed, from the undisputed testimony of the bankrupt and his counsel, that they discussed the royalties transaction with the trustee's attorney, the testimony of the trustee that at all times the bankrupt freely gave him such information as he asked for, and that he began negotiations long before he effected the compromise by which he obtained full title to the royalties, that within a reasonable time after his appointment he was put in possession of facts by the bankrupt showing he claimed an equitable interest in the royalties. While this may not be conclusive, it has weight in deciding the question of fraud vel non.

 It is conclusively shown that in omitting from his schedules any mention of the equity he claimed in the royalties the bankrupt acted on the advice of his attorney. The rule is that when a bankrupt acts on the advice of counsel, after a full disclosure of the facts to him, fraudulent intent may be presumed to be absent. Klein v. Powell (C. C. A.) 174 F. 640; Hunter v. MacFarlane (C. C. A.) 45 F.(2d) 994. There are cases holding that where the advice is given on a question of fact, which the bankrupt should decide for himself, the defense is not avail-

able. Such cases have no application to the situation disclosed in this case, and need not be reviewed.

There is no doubt that Coke Dilworth believed he was the equitable owner of the royalties and wanted to surrender them on his schedules. However, there was no fraud involved in the transaction, and he had no agreement, written or oral, that could be enforced. His equity rested purely in his hope and expectation and in the good intentions of Kokernot. Kokernot was not even morally bound to return the royalties until the note on which he was personally liable had been liquidated by their revenues. There was no certainty when this would happen. If Kokernot had changed his mind, or had become insolvent, or had died, all possible contingencies, the royalties might never have been returned. The equity of the bankrupt in the royalties was not property in esse when the schedules were filed. It is doubtful that the pledge of the lien note could have been set aside as a preference. All the parties to the transaction must have considered the Dilworth Bank and Coke Dilworth were solvent when it was entered into. At least, the trustee acquits them of fraud. Since they were appraised at $95,000, it is doubtful that the royalties had any greater value than that at which they were transferred. Had the transaction been set aside, the trustee would have received no better title than had already been surrendered. Obtaining the equitable title of the bankrupt depended upon the acquiescence of Kokernot. It must be presumed he would not have consented unless he could escape liability on his indorsement. An amicable agreement between the parties would be highly beneficial to the trustee. There is no doubt McMahon believed an ex parte statement from the bankrupt would have complicated the situation. His advice was sound and ethical on a question of law which the bankrupt was incompetent to properly decide for himself. It goes far to acquit the bankrupt of fraudulent intent.

One of the great objects of the Bankruptcy Act (11 USCA) is to relieve an honest debtor of the oppression of his debts when he has surrendered all of his property to be converted into cash for distribution among his creditors. The act is to be reasonably construed to effect that purpose. Williams v. U. S. Fidelity & Guaranty Co., 236 U. S. 549, 35 S. Ct. 289, 59 L. Ed. 713; White v. Brown Shoe Co. (C. C. A.) 30 F. (2d) 674. The trustee has received all the assets of Coke Dilworth that should have been surrendered, without hindrance from

him. The charge that he concealed assets and made a false oath because the equity be believed he had in the royalties was not mentioned in the schedules is technical in the extreme. The reasons for denying a discharge to a bankrupt must be real and substantial, not merely technical and conjectural. The record supports the conclusion that Coke Dilworth was not guilty of knowingly and fraudulently concealing assets and making a false oath in filing schedules omitting mention of an equity in the royalties.

The judgment appealed from is reversed, and the cause is remanded, with instructions to grant a discharge to the bankrupt.

Reversed and remanded.