## UNITED STATES v. SHAPIRO. *
### No. 6674.

Circuit Court of Appeals, Seventh Circuit.
Jan. 10, 1939.

Rehearing Denied Feb. 1, 1939.

Frank A. Darnieder, of Milwaukee, Wis., and Samuel A. Hoffman, of Chicago, Ill., for appellant.

* Writ of certiorari denied 59 S.Ct. 774, 83 L.Ed. ——.

B. J. Husting, U. S. Atty., and E. J. Koelzer, both of Milwaukee, Wis., for appellee.

Before SPARKS, TREANOR and KERNER, Circuit Judges.

KERNER, Circuit Judge.

In this case the appellant, Michael Shapiro, together with the other defendants, Aaron Shapiro and Jack Wallace, was charged by Grand Jury indictment in three counts. The first count charged the defendants with concealing $2762.72 in cash from the trustee in bankruptcy [a violation of Title 11, Sec. 52, Subdiv. (b) (1) of the United States Code, 11 U.S.C.A. § 52 (b) (1)]; the second count charged the defendants with transferring other tangible assets worth $2247.75 with the intent to defeat the operation of the Bankruptcy Law (a violation of Title 11, Sec. 52, Subdiv. (b) (6) of the United States Code, 11 U.S.C.A. § 52 (b) (6)); and the third count charged the defendants with a conspiracy to conceal $4503.72 in cash and $2247.75 in other tangible assets from the trustee in bankruptcy (a violation of Title 18, Sec. 88 of the United States Code, 18 U.S.C.A. § 88). The jury found Jack Wallace not guilty, Aaron Shapiro guilty on the conspiracy count and the appellant, Michael Shapiro, guilty on all three counts. The appellant is here on an appeal taken from a judgment which sentenced him to imprisonment on each count, the sentences to run concurrently.

In order to understand the full force of appellant's contentions on this appeal, it will be necessary to state the facts somewhat in detail.

In February of 1934, the Acme Liquor Company, Inc. (hereafter referred to as the "Liquor Company") was created with its main offices in Milwaukee, Wisconsin. It engaged in the wholesale liquor business until June 30, 1935. In the meantime the Acme Wine and Liquor Company (hereafter referred to as the "Wine Company"), with offices in the same building, had been created to carry on a liquor business. On August 24, 1935, the Liquor Company filed a voluntary petition in bankruptcy and filed bankruptcy schedules showing on the asset side accounts receivable in the sum of $500 which were sold at public sale for $17, and accounts and notes payable to the extent of $18,295.95 on the liability side. On September 5, there was appointed the trustee in bankruptcy who then demanded the books of account. Although it had been neces-

sary to make a demand of each item turned over to him, by September 10 he had received most of the books and by September 18, he had obtained the white sales invoices (concerning which more later).

Uncontradicted testimony from the bookkeepers, Goldie Latter and Margaret Cohn, salesman Jack Wallace and truck drivers, Petermann and Leopold, established the routine of selling liquor and the subsequent recording of sales and cash receipts. When an order for liquor came into the Liquor Company, the invoicing of the sale was made in triplicate. The white invoice was the basis of entries in a separate set of books used exclusively for governmental tax and informational purposes. Either the truck driver or the salesman delivered the liquor to the customer who retained a yellow invoice for himself and usually paid at once in cash or by check. The truck driver or the salesman then returned the cash and the pink invoice to the offices of the Liquor Company where entries in the cash receipts book and sales book were made.

From the testimony of Jack Wallace, Aaron Shapiro and the bookkeepers, the following evidence was adduced. Although Aaron Shapiro and Jack Wallace (also salesman for the Liquor Company) had been made presidents of the Liquor Company and the Wine Company, respectively, they had neither invested any capital nor exercised any voice in the management. The appellant, Michael Shapiro, general manager of both corporations, dictated the corporate policies, supervised the office work, and dealt with the salesmen. Although Aaron Shapiro's name was indispensable to the proper indorsement of checks, he would sign indiscriminately at the request of the appellant or the bookkeepers. The appellant directed the bookkeepers personally, suggested book entries to be made and controlled the purse.

On the other hand, the appellant's testimony denied control over cash entries and withdrawals, professed an ignorance of bookkeeping methods, and disclaimed that he was more active in the business of the Liquor Company than his nephew, Aaron Shapiro.

From the testimony of truck drivers and customers of the Liquor Company, salesman Jack Wallace and James E. Nugent (special agent and accountant of the Federal Bureau of Investigation), the following evidence was established in support of the first count. From May 1, 1935 to August 24, 1935, some

201 sales among others had been made in Jack Wallace's Fox River Valley Territory. On these 201 sales the customers paid $2762.72 to Jack Wallace, who in turn mailed or delivered in person the moneys and accompanying pink invoices to the offices of the Liquor Company. This $2762.72, however, was never recorded in the cash receipts book.

On the other hand, the appellant's testimony suggests that the $2762.72 in cash had never been received because Jack Wallace had embezzled over $2000. As against this testimony, Jack Wallace testified that he had admitted to the appellant a withholding of some $800 during a nine month period, produced convincing verification for most of the $2762.72 turned in and exhibited an accounting by Rae Shapiro (appellant's wife), Vice President of the Liquor Company, as to his commissions on sales made in the Fox River Valley Territory. In addition, subsequent to the $800 admission, Jack Wallace, at the suggestion of appellant, was elected president of the Wine Company.

From the testimony of James E. Nugent, Aaron Shapiro and the bookkeepers, the following evidence in support of the second count was established. On June 30, 1935, the Liquor Company transferred in bulk to the Wine Company practically all of its tangible assets such as liquor inventories, furniture and fixtures, and delivery equipment. The transfer was simply made on a sale invoice used by the Liquor Company in billing customers for liquor purchased. The Wine Company in return gave a check for $2247.75 at a time when its bank balance was only $115.88. The Liquor Company did not record the $2247.75 as cash received, but instead used it to repay the $2247.75 account payable to Marcus Shapiro (appellant's brother) which was recorded on the books of the Liquor Company in pencil.

On the other hand, the appellant in his testimony explained that the check was cashed in the office from the Wine Company's cash on hand, that the check was thereupon deposited at the bank to the credit of the Wine Company, and that the $2247.-75 in cash was given to Marcus Shapiro. As against this testimony, James E. Nugent testified that the appellant in his first explanation of the repayment to Marcus Shapiro had told him that $2300 had been borrowed from Jack Wallace for that purpose. In addition, the bookkeepers testified

that such a large amount of money as $2247.75 had never been received by them as cash to be recorded in the cash receipts books; that the Marcus Shapiro account payable was the only pencil entry in the books; and that the word "Mike" had been erased and the word "Marcus" substituted in its place. The appellant denied that the conversation between James E. Nugent and himself had ever occurred, while Aaron Shapiro testified that at times he carried money to Marcus at the request of the appellant.

From the testimony of James E. Nugent and the bookkeepers, the following evidence was introduced to support the $1741 cash item in the third count. When the Liquor Company made out checks payable to Cash, it was the customary practice to record this as cash received in the cash receipts books. If cash was then used to purchase from a distiller, a debit to inventories and a credit to Cash in the cash disbursement book was recorded. In May of 1935, an analysis of the cash disbursement book and the check register showed that four checks payable to Cash had been made out in the amount of $1741 but this $1741 item was not recorded as cash received by the Liquor Company in its cash receipts book.

On the other hand, the appellant testified that he knew nothing about these checks; that Aaron Shapiro had indorsed them; and that a probable explanation was the acquisition of cash for the purpose of purchasing liquor from distillers who refused to accept Liquor Company checks.

 The principal error assigned is the trial court's failure to set aside the verdict as not amply supported by the evidence. Although most of the evidence is circumstantial, the circumstances were clearly indicative of a purpose of concealment when the bankruptcy occurred, and were sufficient to sustain the verdict rendered. A conspiracy to conceal or the criminal concealment of corporate assets from the trustee in bankruptcy is perpetrated in secrecy and is not readily proved by direct testimony and it is often necessary to prove the crime by circumstantial evidence. In the instant case, appellant's testimony conflicts with the testimony for the government. The government's evidence portrays a picture of circumstances from which a reasonable conclusion follows that the appellant, in contemplation of the Liquor Company's bankruptcy, engineered a plan enabling him to

conceal all of the corporate property from the trustee in bankruptcy. Thus, the criminal activity began at a time when immediate bankruptcy was impending. The cash was taken in two ways. Collections on 201 sales were not received by the corporation and cash in the bank was drawn out without the customary accompanying increase in corporate cash on hand. The evidence pointed to the appellant as the master of this planned process of denuding. Then there occurred the bulk transfer of the remaining assets of the Liquor Company. A personally controlled transferee corporation was created for this purpose, its name being changed to Acme Wine & Liquor Corporation on May 28, 1935. To it went the corporate assets for a check based on a bank balance of $115.88. Again the government's evidence indicates that the appellant was the moving participant. Then followed several movements in the plan of stripping the Liquor Company of its assets, convincingly spelling out a continued concealment from the trustee in bankruptcy. There was scheduled under oath $500 worth of accounts receivable as the only asset in the bankrupt estate. No cooperation to the trustee in bankruptcy was offered and no information concerning the scarcity of assets in the bankrupt estate was volunteered. Disclosure came later through an analysis of the books of account and a subsequent investigation by the government. As against this evidence, there is the appellant's story. This involves a denial of personal control of both corporations and a suggestion to the effect that Jack Wallace and Aaron Shapiro were in fact the active participants. At the most, this testimony makes for conflicting evidence, which in turn introduces a question of considering the weight of the evidence. To weigh the evidence was exclusively for the jury and not reviewable by this court.

In oral argument before this court, counsel for appellant contended that a criminal concealment of cash from the trustee in bankruptcy was not made out, citing the following cases: In re Idzall, D.C., 96 F. 314; Riemer-Gross Co. v. U. S., 6 Cir., 20 F.2d 36; Rachmil v. U. S., 9 Cir., 43 F.2d 878. The contention is that the proof merely indicated appellant's failure to account for the assets prior to the bankruptcy as distinguished from a concealment after bankruptcy. In the Idzall Case, there was introduced evidence that the bankrupt merchant had never kept a careful set of books in the operation of his business and that on his bankruptcy schedules he was not able to account for some of the cash items. In the Riemer-Gross Case, there was introduced evidence that the inventory figure on the bankruptcy schedules did not coincide with the inventory figure taken one year prior to the bankruptcy. In each case the court held that the evidence per se did not establish concealment. The Rachmil Case, holding that there is no concealment from the trustee until he is appointed, borrowed the applicable law on concealment from the opinion in Marcus v. U. S., 3 Cir., 20 F.2d 454, 455, thus:

"When is the offense (section 29b) committed? We have answered that question on given facts in Glass v. United States, [3 Cir.] 231 F. 65. Paraphrasing the section, the offense has three elements—(1) concealment by a person 'while a bankrupt' (2) 'from his trustee' of (3) 'property belonging to the bankrupt estate.' * * * Therefore, the offense is not committed in the sense of being completed until its three elements shall have been established. But the offense may be commenced before any one of them come into existence. In anticipation of bankruptcy and of the election of a trustee, a person may conceal his property; and after bankruptcy, that is, after the creation of a bankrupt estate and the election of a trustee, concealment thus begun may be continued. If the facts show continued concealment, that is the offense denounced by the statute and that is the time of its commission".

In Goetz v. U. S., 7 Cir., 59 F.2d 511, this court held that the statute was sufficiently broad to render any property of the bankrupt subject to concealment. See also Stern v. U. S., 3 Cir., 193 F. 888.

It is to be noted that in all the cases the court is primarily interested in ascertaining whether or not the defendant withheld assets from the trustee in bankruptcy. Omission of any assets from the schedule indicates concealment, but this taken alone is not conclusive. The conduct of the bankrupt, the relative extent of the omission, the character of the asset itself, and the reasons given for the difference between the financial statements of the business and the bankruptcy schedules are the other circumstances in every case. If these circumstances explain the omission, there is no concealment. In other words "if the facts show continued concealment", the offense has been consummated. The crime is complete when the act of concealment or trans-

fer is performed with a criminal intent. U. S. v. Knickerbocker Fur Coat Co., Inc., et al., 2 Cir., 66 F.2d 388.

■ With reference to the cash items of $2762.72 and $1741, we believe that "the facts show continued concealment". The actual sum of $2762.72 was collected and sent in to the corporation via the regular channels of business. This money was intercepted, withheld from the corporation, and never recorded as cash received by the business. As to the $1741 cash item, four checks of the Liquor Company were made payable to Cash and the cash was taken at the bank. This sum was withheld from the business and therefore no record was ever made of it. The $2762.72 and $1741 cash items were then omitted from the bankruptcy schedules and never revealed or explained to the trustee in bankruptcy by the appellant. These instances were neither explainable shrinkages in inventory nor examples of careless accounting practices. As to the $2762.72 item, appellant in his testimony intimated that Jack Wallace had embezzled the money. As to the $1741 item, his explanation on the witness stand was more convincing in that he suggested that perhaps the money had been used to buy liquor inventoriables. Of course, if this cash disposition had been made, the customary entry would have been a debit to inventory in the cash disbursement book. Four times in one month this customary entry was not made. The careful bookkeeping system used by the business militates against a repetition of the same accounting forgetfulness. Then there are other circumstances. The omissions from the bankruptcy schedule were not mistakes or due to inadvertence. The size of the omissions indicated a criminal purpose. There was reported only one asset, accounts receivable sold for $17. All the tangible assets of a corporate business which represented a large investment in capital accounts were omitted from the bankrupt estate. In addition, such incidents as the creation of the corporate transferee, the fictitious transfer, the suspicious pencil account payable to Marcus Shapiro, and the contradicting explanations of the repayment to Marcus Shapiro merely add further color to an atmosphere from which concealment prior to and after bankruptcy is justifiably inferred.

■ As to the bulk transfer transaction, it is appellant's contention that concealment as well as the transfer itself is necessary. The statute provides that the offense is complete if the corporate agent "concealed or transferred" any of the corporate property in contemplation of bankruptcy or with an intent to defeat the operation of the Bankruptcy Act. The object of Congress in passing this criminal statute was to punish those debtors who, although wanting relief from their debts, did not want to surrender what property there was to the creditors. Under such circumstances the objective of the criminal statute is defeated either by a transfer or a concealment. Therefore, it seems to us that the statute was meant to condemn either a transfer or a concealment. A statutory condemnation follows a fortiori where, as in the instant case, the transfer was in bulk and to a personally controlled transferee. This construction of the statute is strengthened by a later amendment which expressly eliminates problems of construction thereafter by substituting the words "concealed or, with or without concealment, transferred". 52 Stat. 855, 11 U. S.C.A. § 52(b) (6). That a District Court has held that concealment was an essential element does not disturb our construction of the statute. U. S. v. Posner, D.C., 3 F. Supp. 252.

■ Even if concealment was a necessary element, we believe that the transfer was only one cog in the carefully planned scheme to evade the Bankruptcy Law, first by denuding the corporation of its property during the immediate bankruptcy period and then by concealing the same from the trustee in charge of the corporate bankrupt's estate. Counsel for appellant contended in the oral argument that the transfer was prejudicial at most and that there was no need to schedule the property transferred, citing the following cases: Dilworth v. Boothe, 5 Cir., 69 F.2d 621; In re Hennebry, D.C., 207 F. 882; Rachmil v. U. S., 9 Cir., 43 F.2d 878. These cases stress the omission and the honest conduct of the bankrupt in fully disclosing to and cooperating with the trustee in bankruptcy. This court in Goetz v. U. S., supra, was emphatic in its disagreement with a contention similar to the one here expounded by appellant's counsel. In that case the contention that a fraudulent transfer prior to bankruptcy need not be scheduled as an asset nor revealed to the trustee by the transferor was condemned by this court. The instant case is one of many omissions from the schedule. In fact one insignificant asset alone was reported. Nor did the appellant disclose the condemned transactions to the trustee. On

the contrary, the books of account were obtained only after a demand for each one was made, and disclosure came from sources other than appellant.

Our analysis and treatment of the first two counts of the indictment (the cash and bulk transfer items) precludes a further consideration of the conspiracy count. We have given the case very serious consideration and have carefully examined all of the testimony and are convinced that the verdict was sufficiently supported by the evidence and that the court did not err in refusing to set aside the verdict of guilty as charged in the three counts. The judgment of the trial court is therefore affirmed.