UNITED STATES of America,

v.

Stephen J. SABBETH, Defendant.

No. 97–CR–0421 DRH.

United States District Court,
E.D. New York.

Dec. 22, 2000.

Loretta E. Lynch, United States Attorney, Eastern District of New York, by Charles S. Kleinberg, Asst. U.S. Atty., Brooklyn, NY, for the Government.

Wilmer, Cutler & Pickering by Lewis J. Liman, New York City, for Defendant.

## MEMORANDUM AND ORDER

HURLEY, District Judge.

Pending before the Court is the application of Stephen J. Sabbeth ("Sabbeth") for bail pending appeal. The controlling statute, 18 U.S.C. § 3143, provides in pertinent part as follows:

(b) *Release or detention pending appeal by the defendant.*—(1) ... the judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal ..., be detained, unless the judicial officer finds—

(A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released ....; and

(B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in—

(i) reversal,

(ii) an order for a new trial,

(iii) a sentence that does not include a term of imprisonment, or

(iv) a reduced sentence to a term of imprisonment less than the ... expected duration of the appeal process.

18 U.S.C. § 3143.

█ Notwithstanding the language of § 3143 that seemingly conditions the availability of bail pending appeal on a showing that the conviction or sentence under attack is likely to be disturbed on appeal, the Section has not been so interpreted. *See United States v. Hart,* 906 F.Supp. 102, 106 (N.D.N.Y.1995). Rather, as explained by the Second Circuit in *United States v. Randell,* 761 F.2d 122 (2d Cir.1985):

[The] appropriate interpretation ... requires a district court to determine first whether any question raised on appeal is a "substantial" one. The *Miller* court defined a substantial question as "one which is either novel, which has not been decided by controlling precedent, or which is fairly doubtful." [*United States v. Miller,* 753 F.2d 19, 23 (3d Cir.1985) ]. *Giancola* held that a substantial question "is one of more substance than would be necessary to a finding that it was not frivolous. It is a 'close' question or one that very well could be decided either way." [*United States v. Giancola,* 754 F.2d 898, 901 (11th Cir.1985) ]. *Handy* defined substantial as "fairly debatable." [*United States v. Handy,* 753 F.2d 1487, 1490, *amended by* 761 F.2d 1279 (9th Cir.1985) ]. We do not believe

that these definitions of "substantial" differ significantly from each other, but if we were to adopt only one, it would be the language of *Giancola.*

*Id.* at 125 (footnote omitted).

If the presence of a substantial question is demonstrated, the movant must then establish that the question is " 'so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial.' " *Id.* (quoting *Miller,* 753 F.2d at 23).

Sabbeth neither represents a risk of flight nor a danger to another or the community. Absent from the record is anything to suggest that his appeal is for the purpose of delay. Accordingly, the present application turns on whether the issue broached is "substantial."

## BACKGROUND

### 1. *Counts of Conviction*

Sabbeth stands convicted, after a trial by jury, under each of the six counts of Indictment 97–CR–421(S)(DRH).

Count One charged that:

On or about and between June 1, 1990 and April 1992, [he] . . . acting individually and as an agent of Sabbeth Industries, together with others, in contemplation of the filing of a case under Title 11 of the United States Code by Sabbeth Industries, and with intent to defeat the provisions of Title 11 of the United States Code, did knowingly and intentionally conspire to fraudulently transfer and conceal property belonging to Sabbeth Industries, in violation of Title 18, United States Code, Section 152 (1993).

(Indictment ¶ 13.)

Count Two charged that

On or about and between June 1, 1990 and April 1992, . . . [he] individually and as an agent of Sabbeth Industries, together with others, in contemplation of a

case under Title 11 of the United States Code by Sabbeth Industries, and with intent to defeat the provisions of Title 11 of the United States Code, did knowingly, intentionally and fraudulently transfer and conceal property belonging to Sabbeth Industries.

(Indictment ¶ 16.)

Counts Three, Four, and Five each charged Sabbeth with having committed perjury in a proceeding under Title 11 of the United States Code. Under Count Six, he was accused of having engaged in money laundering in violation of Title 18 U.S.C. § 1956 with respect to "the proceeds of specified unlawful activities, to wit, monies unlawfully transferred and concealed from Sabbeth Industries, Ltd. in violation of Title 18 U.S.C., § 152 (1993)." (Indictment ¶ 24.)

### 2. *Evidence at Trial*

Sabbeth was the sole shareholder of Sabbeth Industries, Ltd. ("Sabbeth Industries") and its president until December of 1990. He also was the corporation's landlord, and lent monies to the corporation periodically.

After many years of successful operations, Sabbeth Industries experienced plummeting sales during the late 1980s. By the end of the decade, it was in dire financial straits and a probable candidate for bankruptcy. It managed to survive because of a revolving line of credit provided jointly by National Westminister Bank USA ("Nat West") and Manufacturers Hanover Trust, Co. ("Manufacturers"), the outstanding balance of which ranged between $14,000,000 and $18,000,000 during the period from July 1989 to September 1990. The indebtedness was collateralized via a pledge of basically all of Sabbeth Industries' assets and was personally guaranteed by Sabbeth.

Sabbeth Industries also owed Sabbeth approximately $2,000,000 for past due obligations.[1] However, that debt was subordi-

---

1. Sabbeth had owed Sabbeth Industries $889,000.00, but that indebtedness was fully

nated to the bank indebtedness pursuant to subordination agreements which bore a number of signatures including Sabbeth's.

Notwithstanding what was intended by the banks to be a tightly controlled line of credit, it developed that Sabbeth had been withdrawing funds from Sabbeth Industries during 1990. The total sums taken exceeded $1,000,000, with approximately $750,000 of that amount being received by Sabbeth from June 1, 1990 to December 28, 1990 in the form of fifty-five Sabbeth Industries' checks. The corporation filed a voluntary petition for Chapter 11 reorganization on December 28, 1990.

Sabbeth categorizes the above-referenced payments to him as being made "openly." (Def.'s Mem. Supp. at 3.) That characterization is accurate in the sense the payments were made by corporate checks. Additionally, Sabbeth had testified during the bankruptcy proceeding that a Nat West loan officer had approved his withdrawal of funds from Sabbeth Industries notwithstanding, inter alia, the subordination agreements and his personal guarantee. The jury was aware of the bankruptcy court testimony in that it was the subject matter for Sabbeth's conviction for perjury under Count Four.

The jury also heard testimony, however, that the banks were unaware that corporate checks were being written to Sabbeth for antecedent debts prior to being alerted to that fact by a third party in mid-November 1990. That third party was Robert Eisenberg, a business consultant hired by the corporation-at the request of the banks-to stop the downward spiral. Upon being tipped-off by Eisenberg of Sabbeth's activities, Nat West obtained copies of Sabbeth Industries' checks from its check retention department which confirmed the subject payments. Bank officers then confronted Sabbeth on a number of occasions, each time angrily demanding to know what he had done with the money. He obliquely responded by simply indicating that he no longer had it, although he did tell Eisenberg when they were alone that the

missing monies were used to prevent his brother-in-law from being killed by the Mafia due to unpaid gambling debts.

As later discovered, however, the bulk of the funds were in the C. Fiore brokerage account which was established by Sabbeth in December 1989 using his wife's maiden name, his mother-in-law's home address, and with a number of false entries, including a bogus social security number. The subject monies that Sabbeth received from Sabbeth Industries traveled through various bank and brokerage accounts on route to the C. Fiore account. (*See* Gov't's Trial Exs. 231–235.) Those transfers are the subject of the money laundering charged in Count Six.

### 3. *Basis for Present Application*

In seeking bail pending appeal, Sabbeth identifies the "substantial" legal issue for purposes of § 3143 as the instruction given to the jury concerning "property belonging to Sabbeth Industries." (Def.'s Mem. Supp. at 3–4.) Sabbeth proffers that the definition provided by the Court was wrong. He urges now, as he did at trial, that since the monies that Sabbeth removed from the corporation, and thereafter secreted, were "in payment of bona fide debts" owed to Sabbeth, the sums involved ceased being corporate property at the moment of transfer and thereafter constituted "his property"; as such, he could not be legitimately convicted of bankruptcy fraud, and concomitant money laundering, involving the "property of Sabbeth Industries." *Id.*

Sabbeth contends that the legitimacy of the other counts of his conviction are "called into doubt" and "equally shaky" given the purported charging deficiencies as to Counts One and Two. (Def.'s Mem. Supp. at 28.)

### DISCUSSION

### 1. *Section 152(7) and its Purpose*

The bankruptcy fraud conspiracy and substantive bankruptcy fraud charged in

---

reserved, i.e., "written off" as uncollectible,      by September 1989.

Counts One and Two are based on 18 U.S.C. § 152(7). The relevant portion of that section reads:

A person who-

. . . . .

(7) in a personal capacity or as an agent or officer of any person or corporation, in contemplation of a case under title 11 by or against the person or any other person or corporation, or with intent to defeat the provisions of title 11, knowingly and fraudulently transfers or conceals any of his property or the property of such other person or corporation; ...

. . . . .

shall be fined under this title, imprisoned not more than five years, or both. 18 U.S.C. § 152(7).

■ The purpose of criminalizing a transfer or concealment of assets, if done with the requisite mens rea, and in contemplation of bankruptcy or to defeat the provisions of Title 11, is to prevent and punish efforts to circumvent the provisions of Title 11, including the "priorities among creditors ... and the rule that claimants within a class share pro rata." (Def.'s Request to Charge # 20); *see also United States v. Shapiro,* 101 F.2d 375, 379 (7th Cir.1939).

### 2. *Positions of Parties at Trial*

The shared focal point at trial of the prosecution and defense was the initial transfers from Sabbeth Industries to Sabbeth.

The prosecution's case followed the scenario set forth in the indictment, viz., that Sabbeth violated § 152(7) each time he withdrew funds from Sabbeth Industry given the attendant circumstances, and that each subsequent transfer and concealment of those criminally derived funds triggered a further violation of the statute. (Trial Tr. ("Tr.") at 32 (government's opening), 3267 (government's summation).) The government used the existence of the C. Fiore account to underscore Sabbeth's criminal intent in withdrawing funds from Sabbeth Industries and in the transfers that occurred thereafter.

The defense countered by arguing that the monies paid to Sabbeth were for bona fide debts and thus became his funds upon their receipt; the jury was also told that the payments were made openly and with the approval of the banks. (Tr. at 67 (defendant's opening), 3382 (defendant's summation).)

### 3. *Defendant's Request to Charge # 17*

■ Consistent with the position argued to the jury, the defense proffered the following request to charge:

The second element that the government must prove beyond a reasonable doubt is that the property transferred or concealed by Stephen Sabbeth was the property of Sabbeth Industries or the bankruptcy estate of Sabbeth Industries.

The property of Sabbeth Industries includes any legal or equitable interests in property held by Sabbeth Industries.

Property belonging to the bankruptcy estate of Sabbeth Industries includes all legal or equitable interests of Sabbeth Industries in property as of the commencement of the Chapter 11 case. In this case, the Chapter 11 bankruptcy petition was filed on December 26, 1990. Property over which the debtor-in-possession, trustee or creditor asserts, or otherwise may have, a right to recover-whether on the ground that a prior transfer of such property was a fraudulent conveyance or a voidable preference-is not property of the bankruptcy estate until such property is recovered.

Transfers or concealment of property that you find belonged to Stephen Sabbeth or Carole Sabbeth cannot support a finding of guilt under Count Two, even if you find all of the other elements have been met. Thus, if you find that Sabbeth Industries made payments to Ste-

phen Sabbeth on account of a debt or obligation it owed him, then any subsequent transfer or concealment of that money does not constitute a transfer or concealment of the property of Sabbeth Industries, and you must return a verdict of not guilty.

(Def.'s Req. Charge # 17, at 25–26.)

■ A party does not have a right to have a requested instruction included within the Court's charge, even if it dovetails with that party's theory of the case, unless it correctly states the law. Request # 17 fails to satisfy that prerequisite.

In arguing to the contrary, Sabbeth posits that the term "property" entails "possession" for purposes of § 152(7). (Def.'s Mem. Supp. at 10.) And from that, the argument continues, the funds received by Sabbeth-even if in payment for past due debts-may not be deemed to be corporate property since the corporation no longer had possession of the funds. At most, in Sabbeth's view, Sabbeth Industries retained a right to try to recover possession via the pursuit of a preference action in the bankruptcy court.

As explained in *Kokoszka v. Belford,* 417 U.S. 642, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974), "[t]he term [property] has never been given a precise or universal definition." *Id.* at 645, 94 S.Ct. 2431. Instead, its meaning must be determined within the statutory context of which it is a part. *See id.*

The "[a]uthority" furnished by Sabbeth for request # 17 was 11 U.S.C. § 541, *FDIC v. Hirsch (In re Colonial Realty Co.),* 980 F.2d 125 (2d Cir.1992), *Maxwell Communications Corp. v. Societe General PLC (In re Maxwell Communications Corp.),* 186 B.R. 807, 819–20 (S.D.N.Y. 1995), *aff'd,* 93 F.3d 1036 (2d Cir.1996), and *Corporate Food Management, Inc. v. Suffolk County College (In re Corporate Food Management, Inc.),* 223 B.R. 635, 642–43 (Bankr.E.D.N.Y.1998). (Def.'s Req. Charge at 26.) Section 541 defines the term "property of the debtor's estate" under Title 11 and the three cases cited indicate that preferential transfers (11 U.S.C. § 547) and fraudulent conveyances (11 U.S.C. § 548) are not included as part of the debtor's estate in bankruptcy court unless and until the transfers are set aside. As noted by the government, that is an "entirely rational construction of Congressional intent as to the meaning of the technical bankruptcy term 'property of the debtor's estate', since the trustee cannot distribute among creditors property that he does not have." (Gov't's Mem. Opp. at 25–26.)

Sabbeth, however, was not charged with violating a provision of Title 11, of course, but rather with criminal conduct under Title 18. And the section of Title 18 found by the jury to have been violated, § 152(7), has its own purpose and elements. *See United States v. West,* 22 F.3d 586, 589–90 (5th Cir.1994) (holding that transfer may provide basis for violation of § 152(7) even if occurred more than one year prior to filing of bankruptcy petition; only requirements for conviction are that transfer was made knowingly, fraudulently and with the intent to defeat provisions of the bankruptcy code); *United States v. Moody,* 923 F.2d 341, 347 (5th Cir.1991) ("[Section 152(7)] does not use the term 'property of the debtor.' Accordingly, there is no need to dissect the Bankruptcy Code. We will not give the plain wording and meaning of [§ 152(7)] the strained, hypertechnical reading urged by Moody." (footnote omitted)).

Significantly absent from § 152(7) is any reference to such terms as "preference" or "bona fide" debt, which are the cornerstones of Sabbeth's argument concerning what constitutes "property" for present purposes. Moreover, the conduct of Sabbeth in taking property from his business on the eve of bankruptcy fits squarely within the previously explained purpose of § 152(7).

An application of the rationale underlying Sabbeth's argument would produce anomalous results in a number of situa-

tions. For example, money taken by a corporate insider in satisfaction of an antecedent debt-made in contemplation of bankruptcy and for the purpose of receiving more from the corporation vis-à-vis other creditors than would be the case under the equitable distribution provisions of the Bankruptcy Code-could not be prosecuted under § 152(7) if (a) the estate representative waits more than a year to act or otherwise "drops the ball" in seeking to recover monies taken as a preference under 11 U.S.C. § 547, or (b) if the corporation somehow managed to escape bankruptcy.[2] Moreover, even if the corporation in the above example went bankrupt and the estate were successful in recovering the sums taken for purposes of distribution pursuant to the Bankruptcy Code, no criminal proceeding could be commenced until the completion of the preference action, including any possible appeals. Such impediments and preconditions to prosecution surely were not envisioned by the Congress in enacting § 152(7).

Sabbeth's position at trial, and today, is that if the monies he took from his corporation during 1990–even if done in contemplation of bankruptcy and/or to defeat the distribution provisions of Title 11–were in satisfaction of antecedent debts, the subject of those transfers could not be deemed "property of Sabbeth Industries" for purposes of § 152(7) as a matter of law. Instead, the defense sees the subject monies as being simply targets for possible preference, or fraudulent conveyance actions to be commenced by the bankrupt estate. With respect to subsequent transfers, if the initial transfers to Sabbeth were "in satisfaction of bona fide debts," then such funds are characterized as "his personal property to use as he wished" (Def.'s Mem. Supp. at 4).

**2.** As noted in *Burke v, Dowling*, 944 F.Supp. 1036, (E.D.N.Y.1995), "[u]nlike the other provisions of § 152, [subsection 7] does not appear to require that a Title 11 case actually be pending. All that it requires is that the defendant transfer assets with the ultimate intent to

The above represents the message sought to be conveyed under charge request # 17. That message is incorrect. Accordingly, the Court declined to so charge the jury.

4. *Charge to Jury re: Meaning of "Property" Under § 152(7)*

Upon concluding that Sabbeth's requested charge # 17 was erroneous, the Court looked to Sand's *Modern Federal Jury Instructions* for possible assistance.

Instruction 15–8 provides, in pertinent part:

[T]he government must prove … that in contemplation of a bankruptcy proceeding, defendant transferred property *which would belong to the estate of the debtor.*

1 Leonard B. Sand, *Modern Federal Jury Instructions* ¶ 15.01[3] (1999) (emphasis added). Instruction 15–6 provides in pertinent part:

*The term "estate of the debtor" also includes interests in property owned by the debtor within one year before the bankruptcy petition was filed.*

*Id.* ¶ 15.01[2] (emphasis added); *see also* Seventh Circuit, *Federal Jury Instructions*, Offense Instructions for 18 U.S.C. § 152(7) ( [T]he government must prove … [that] the defendant transferred or concealed certain property … *which belonged or would belong to the bankrupt estate.* (emphasis added)).

While the Court noted at the time of trial that the meaning of § 152(7) is relatively "straightforward" (Tr. at 3060), its applicability to certain situations is at least arguably problematic. For example, under what circumstances, if any, would payment of current obligations as they became due run afoul of the statute?

defraud a bankruptcy court, whether or not such proceedings ever actually commence." *Id.* at 1065. Under Sabbeth's theory a violation of 152(7) obviously could not occur in a case such as the one at bar absent, inter alia, a bankruptcy petition being filed.

The definition of "property belonging to Sabbeth Industries" given by the Court was as follows:

> As to this element of Count Two, the government must establish that the property transferred or concealed by defendant was the property of Sabbeth Industries or of the bankruptcy estate of Sabbeth Industries.

> The property of Sabbeth Industries consists of any legal or equitable interest in property held by Sabbeth Industries. It includes any corporate property transferred to defendant during 1990 before the bankruptcy petition was filed on December 28, 1990, which property-but for the transfer or transfers-would have been included in the bankruptcy estate of Sabbeth Industries. Sums, if any, paid to defendant for past due interest or past due rents-that is for antecedent debt(s)-would constitute property for purposes of Section 152, if the payment or payments were made while the corporation was insolvent; conversely, monies, if any, paid to defendant by Sabbeth Industries for current obligations, such as for current rent or current interest, would not have been property of the bankruptcy estate upon the filing of bankruptcy petition, but rather would have been defendant's property.

> "Insolvency" indicates a financial condition such that the sum of the entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of property transferred, concealed, or removed with intent to defraud the entity's creditors.

> The property of Sabbeth Industries, as above defined, became the property of the bankruptcy estate upon the bankruptcy petition being filed on December 28, 1990.

> The indictment charges that defendant fraudulently concealed monies received from Sabbeth Industries both before, and after the filing of the petition. Given the continuing nature of the alleged concealment, you also need

a definition of property held by the bankruptcy estate of Sabbeth Industries. However, the definition is the same for purposes of this element of Count Two, whether the property belonged to Sabbeth Industries before the filing, or to the bankruptcy estate after December 28, 1990. For that reason, the definition of property provided above with respect to Sabbeth Industries is incorporated by reference here, that is, with respect to the bankruptcy estate.

The above definition is contained in the third element of the substantive bankruptcy fraud crime alleged in Count Two, and incorporated by reference as to Count One. By way of context, the Court's instruction as to all of the elements required to be proven under Count Two was:

> In order to sustain this charge, the government must prove each of the following elements beyond a reasonable doubt:

> First: That the defendant transferred or concealed property;

> Second: That the property transferred or concealed belonged to Sabbeth Industries or to the bankruptcy estate of Sabbeth Industries;

> Third: That the defendant transferred or concealed this property while acting individually or as an agent of Sabbeth Industries, Ltd.;

> Fourth: That these actions were committed by the defendant in contemplation of a case under Title 11, United States Code, by Sabbeth Industries, Ltd., or with the intent to defeat the provisions of Title 11; and

> Fifth: That the defendant did so knowingly, fraudulently, and intentionally.

The charge given to the jury was based primarily on the language and purpose of § 152(7), supplemented by consideration of such cases as *Moody* and *West* as well as

the proposed charge in Sand's *Federal Jury Instructions.*

To the extent the charge under attack embellished on the Sand's charge, the additions narrowed the type of conduct embraced by the statute. For example, absent from § 152(7) is any reference to a person or corporation being insolvent at the time of a subject transfer. Similarly, § 152(7) seemingly would not preclude a prosecution of transfers for contemporaneous value, assuming the presence of all of the elements of the crime. Yet, given the paucity of authority, and consistent with the concept of lenity, limiting language was added by the Court to the Sand's charge. Whether that should have been done may be debatable, but surely not by Sabbeth who was the beneficiary of the additions.

Essentially all of the arguments made in support of the present application were voiced at length during the trial by highly skilled counsel. One argument, however, has newly surfaced, viz.:

> [A]s the government sees it, the disputed rent and interest payments remained Sabbeth Industries' from the outset because Mr. Sabbeth committed fraud in those initial transactions. *But that is the problem with the charge in this case.* Indeed, under the Court's instructions, the jury was directed that the disputed funds remained company property, regardless of whether there was any initial fraud, provided only that those funds were paid by Mr. Sabbeth in satisfaction of antecedent debts while the company was insolvent. Under this instruction, even if the jury specifically concluded that there was no fraud in the initial transaction, it would be required to treat the money as company property for purpose of all subsequent transactions.

(Def.'s Surreply at 6.)

Sabbeth argued at trial that the initial transfers were lawful and, accordingly, those that followed were as well, the theory being that the property ceased being that of Sabbeth Industries as a matter of law upon its use to pay antecedent debts. And that was the basis for Sabbeth's requests to charge. But, as noted, the Court declined to charge that theory and, accordingly, request #17–which embodied Sabbeth's trial position-was not given.

With respect to the current argument, it too turns on the meaning of the term "property of Sabbeth Industries." Assume the jury concluded that Sabbeth was not guilty of, for instance, Count Two vis-à-vis the initial transfers to him due to the government's failure to prove one or more of the "non-property" elements of the crime. Would the Court's charge, as given, leave the jury "rudderless" at that point? The answer to that question is no.

The jury was instructed to consider each transfer and act of concealment separately. They were given the elements which the government was required to prove beyond a reasonable doubt to warrant conviction. And the property subject to transfer or concealment remained the property of Sabbeth Industries whether the violation occurred upon transfer *to* Sabbeth, or not until the transfers *from* Sabbeth for purposes of § 152(7). That conclusion borders on being self-evident as to transfers to Sabbeth. His receipt of each corporate check in payment of an antecedent debt-assuming all elements of § 152(7) were present-was criminal at the moment of transfer. *United States v. Shapiro,* 101 F.2d 375, 378–79 (7th Cir.1939) ("The crime is complete when the act of . . . transfer is performed with a criminal intent."). Not surprisingly, Sabbeth proffers no case suggesting that a criminal act of transfer vests a property interest in the transferee for purposes of the statute. The monies so acquired by him retained their illegal status, rendering subsequent transfers and concomitant concealment efforts violative of the statute, again, if accompanied by criminal intent.

Although perhaps less obvious, non-criminal corporate payments to Sabbeth for antecedent debts similarly would re-

main "property of Sabbeth Industries" for purpose of the statute. That label would have no meaning, however, unless Sabbeth-who agrees that all of the subject payments to him were preferences under § 547 of the Bankruptcy Code-later elected to secrete the payments received with the criminal purpose of preventing their return to the corporation for equitable distribution among its creditors. Judge Sand's proposed charge, along with the Seventh Circuit's-including their explanations that "property" includes items which would have belonged to the estate but for the subject transfers-is correct. The contrary conclusion urged by Sabbeth, i.e., that the monies became "his" and remained so under § 152(7) unless and until returned to the estate through a successful preference action in the bankruptcy court, is subject to precisely the same criticisms germane to the scenario of the initial corporate transfers to Sabbeth being criminal in character. *See supra* pp. 38–39.

Finally, Sabbeth places considerable stock in the words "his" and "corporation" appearing as modifiers to "property" in § 152(7). Indeed, that fact is the cornerstone of his "constructive amendment" argument. Yet the simpler, more convincing explanation is that their inclusion within the statute simply reflects that individuals and corporations fall within the Section's ambit and nothing more.

The above analysis dovetails, inter alia, with the language and purpose of § 152(7), and is consistent with both the Sand and Seventh Circuit proposed charges.

In conclusion of this section of the opinion, Sabbeth's contention that the "property" instruction given to the jury was flawed-for its failure to adopt the rationale embodied in his charge request #17–remains unconvincing. Moreover, the charge given adequately instructed the jury as to Counts One and Two.

### 5. *"Substantial Issue" as to Counts One and Two*

■ Notwithstanding that the Court is of the belief that no reversible error occurred with respect to Counts One and Two, that does not end the inquiry for purposes of the present application. *See Hart*, 906 F.Supp. at 106. Here, a juxtapositioning of the arguments raised by Sabbeth against the explanation provided by the Second Circuit in *Randell* as to the meaning of § 3143(b)(1)(B), demonstrates the existence of a "substantial issue" for appeal with respect to those counts.

If Sabbeth's property argument is accepted by the Circuit Court, his convictions for bankruptcy fraud under the first two counts of the indictment presumably will be reversed. In that regard, the "correct interpretation of the clause 'property of the corporation' under Section 152(7) presents a question of first impression in this and other Circuits." (Def.'s Surreply at 2.) While such cases as *Colonial Realty, Maxwell Communications*, and *In re Saunders*, 101 B.R. 303 (Bankr.N.D.Fla. 1989)-which address the issue of what constitutes the property of an estate for purposes of a bankruptcy proceeding-fail to shed light on the issue at hand, other cases relied upon by Sabbeth during the trial and currently, although distinguishable, are germane.

In *United States v. Alper*, 156 F.2d 222 (2d Cir.1946), appellant, a creditor of debtor Chernow, was convicted under a predecessor statute of 18 U.S.C. § 152(1), which criminalizes the knowingly and fraudulent concealment of property belonging to a bankrupt estate. *See id.* at 223.

Chernow was in default under notes held by Alper. *See id.* at 224. Alper suggested that Chernow buy large amounts of liquor on credit, use some of that liquor to satisfy the outstanding indebtedness to him, and then file for bankruptcy. *See id.* Alper's suggestion was implemented by Chernow. *See id.*

Following discovery of the above scenario, Alper was charged and convicted of concealing goods from Chernow's trustee in bankruptcy. *See id.* at 223. That con-

viction was reversed by the Second Circuit, with the Court holding that the cases of liquor received by Alper, to the extent that they were in payment of a debt, constituted a preference but not a concealment of assets. *See id.* at 224. In so holding, the Court cited *Levinson v. United States,* 47 F.2d 451 (6th Cir.1931), *see id.,* another case upon which Sabbeth relies.

Both *Alper* and *Levinson,* however, involved what is now § 152(1), the language and terminology of which is different than § 152(7). And, as noted in *Moody,* the two subdivisions are concerned with different types of wrongdoing and each should be interpreted consistent with its own language. *See Moody,* 923 F.2d at 347. Nonetheless, the holdings in *Alper* and *Levinson* raise a "substantial issue" regarding the legitimacy of the convictions under Counts One and Two.

6. Absence of Substantial Issue as to Convictions and *Sentence Under Counts Three, Four and Five*

Under Counts Three, Four and Five, Sabbeth stands convicted of "knowingly and fraudulently mak[ing] a false oath ... in relation to [a] case under title 11" in violation of § 152(2).

Count Three alleged that Sabbeth lied when, during a deposition conducted on March 17, 1992, he falsely testified that the bogus social security number under which the C. Fiore account was opened was due to an error by the brokerage house, and that his wife had asked the brokerage house to correct the error "way before" Nat West obtained a restraining order on the C. Fiore account as part of its efforts to recover the secreted funds for the bank.

Count Four and Five alleged that Sabbeth made false statements under oath on April 27, 1992 during a hearing before Judge Goetz in the bankruptcy court. The charged false statements both pertain to Sabbeth testifying that he received prior approval from the banks for his withdrawals from Sabbeth Industries during the year preceding bankruptcy. The bulk of those monies, viz. $892,279.00, were in the C. Fiore account as of May 1992. (Gov't's Trial Ex. 15-i.)

The false testimony charged in Counts Three, Four and Five were given during proceedings in the bankruptcy court, the purpose of which was to determine whether the funds taken by Sabbeth from Sabbeth Industries, and traced to the C. Fiore account, were to be restored to the estate or awarded to the other claimant, Nat West.

With respect to those three counts, the government was, as explained to the jury, required to establish each of the following five elements beyond a reasonable doubt:

First: That there existed a proceeding under Title 11, United States Code, which as I have previously explained, contains the federal laws relating to the petition for the reorganization under bankruptcy filed by Sabbeth Industries, Ltd.;

Second: That defendant Stephen J. Sabbeth made a statement under oath in or in relation to the proceeding referred to in the first element;

Third: That the statement concerned a material fact;

Fourth: That the statement was false; and

Fifth: That the defendant acted knowingly and with the intent to defraud.

None of the above elements require discussion for present purposes other than the word "material" which does not appear in § 152(2). The courts have interpreted the judicially crafted element of materiality broadly. *United States v. O'Donnell,* 539 F.2d 1233, 1237–38 (9th Cir.1976). As explained in *United States v. Lindholm,* 24 F.3d 1078 (9th Cir.1994):

The scope of materiality [under 18 U.S.C. § 152(2) ] includes: (1) matters

relating to the extent and nature of the bankrupt's assets; (2) inquiries relating to the bankrupt's business transactions or his estate; (3) matters relating to the discovery of assets; (4) the history of a bankrupt's financial transactions; and (5) statements designed to secure adjudication by a particular bankruptcy court.

*Id.* at 1083 (citing *O'Donnell,* 539 F.2d at 1237–38).

 Understandably, given "the broad definition" of materiality for purposes of § 152(2), the element is "readily established," and does not require proof that creditors were harmed, or misled by the false statements. *United States v. Key,* 859 F.2d 1257, 1261 (7th Cir.1988); *United States v. Phillips,* 606 F.2d 884, 887 (9th Cir.1979); *O'Donnell,* 539 F.2d at 1237.

 From the above discussion of what constitutes materiality for purposes of § 152(2), it can be seen that Sabbeth's distinction between "property of Sabbeth Industries" and "his property" is irrelevant as to Counts Three, Four and Five. Which is to say, the determination of whether the funds in the C. Fiore account belonged to the estate, or to Nat West, did not hinge, directly or indirectly, on the definitional parsing which is central to Sabbeth's attack on his convictions under the first two counts of the indictment.

Instead, reference to the type of matters listed as material in *Lindholm*-and Sabbeth's testimony in the bankruptcy proceedings seems to fall within each of the listed items-, viewed in conjunction with the other elements that the government was required to establish under § 152(2), strongly suggests the absence of any issue, substantial or otherwise, as to the three perjury convictions. Accordingly, Sabbeth's argument that the purported invalidity of his convictions under Counts One and Two taint his convictions under Counts Three, Four and Five lacks merit.

During the preference action pursued by Sabbeth Industries to recover the monies in the C. Fiore account, Sabbeth acknowledged that the sum previously mentioned represented monies he took from the corporation in payment of antecedent debts. That evidence is significant because it bears on the sentencing guideline range which would be applicable if the only counts of conviction were Counts Three, Four and Five.

As noted in the pre-sentence report, the base offense level for the perjury is 6. (PSR ¶ 68.) Since the amount of funds involved, however, is over $800,000, the offense level is increased by 11. (*Id.* ¶ 69.) Therefore, even absent any other adjustment such as for more than minimal planning being made, the adjusted offense level would be 17, which, with a criminal history category of I, would call for a range of incarceration of between 24 and 30 months.

In sum, given the independent character of the convictions under Counts Three, Four and Five, there is no reason to believe that Sabbeth would be granted a new trial as to those counts of conviction even if, arguendo, his convictions under Counts One and Two were reversed. And the probable sentence that he would receive for those three counts standing alone would far exceed the likely time required to decide his appeal. Given the circumstances, Sabbeth's argument directed to Count Six need not be addressed.

## CONCLUSION

For the reasons indicated with respect to Sabbeth's convictions under Counts Three, Four and Five, his application for bail pending appeal is denied. He shall surrender to the designated correction facility to begin service of his sentence by 2:00 p.m. on January 26, 2001.

The above constitutes the decision and order of the Court.

SO ORDERED.